FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FEB 2 1 2003 3:50pm

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| STEPHANIE GOETZ and | § | CIVIL ACTION NO. A-02-CA-081-JN |
| KEVIN MCGILL, | § | |
| Individually and on Behalf of | § | |
| All Others Similarly Situated, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| SYNTHESYS TECHNOLOGIES, INC; | § | |
| MICHAEL J. FLEISCHHAUER; | § | |
| HARRY GITTES; | § | |
| WALTER LOEWENBAUM; | § | |
| JAMES KEVER; MARVIN GRESHAM | § | |
| PERSONAL ADMINISTRATORS; and | § | |
| PATTI O'MEARA, | § | |
|     Defendants. | § | COLLECTIVE ACTION |

## DEFENDANTS O'MEARA AND PERSONAL ADMINISTRATORS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JAMES NOWLIN:

Defendants Patti O'Meara and Personal Administrators seek summary judgment on all claims against them for the following reasons:

### I.    Introduction

In this case, Plaintiff Stephanie Goetz makes several attempts to hold her former employer, Personal Administrators, and its president, Patti O'Meara, liable for firing her from her at-will job. In one approach, she claims that Personal Administrators and O'Meara are liable for conspiring to tortiously interfere with her employment contract. Because Texas law is clear that a party to a contract cannot be liable for tortiously interfering with that contract, O'Meara and Personal Administrators are entitled to summary judgment on this first claim.

*45*

Goetz's second claim is essentially that the Fair Labor Standards Act absolutely entitles her to apply for and accept a job that would give her complete access to the personal finances and records of a man she is suing. Because Goetz's serious conflict of interest interfered with her ability to do her job, because Goetz never revealed this conflict, and because there was no feasible way to separate Goetz from the records of the client she was suing, O'Meara and Personal Administrators had a legitimate, non-retaliatory reason to fire her.

Finally, O'Meara and Personal Administrators are entitled to summary judgment on Goetz's amorphous civil conspiracy claim. It is unclear what conduct is covered by this claim, but to the extent that it does not merely restate the claims discussed above, Goetz can produce no evidence creating a fact question on the elements necessary for liability under conspiracy law.

## II.    Background: Claims against Synthesys

At the heart of this lawsuit are Fair Labor Standards Act ("FLSA") and Texas Payday Act claims against Synthesys Technology ("Synthesys"). Two former Synthesys employees, Stephanie Goetz and Kevin McGill, have sued for wages that they claim were never paid to them as Synthesys collapsed. They have brought the FLSA claim on their own behalf and are seeking permission to proceed on behalf of allegedly similarly situated employees. Additionally, Goetz and McGill seek payment for overtime work they allegedly performed throughout the entire period of their employment. [1]  For these wage-related claims, the two named Plaintiffs filed suit against Synthesys, Synthesys' president, and individual members (and former members) of Synthesys' board of

---

[1] It is not clear from Plaintiffs' various pleadings whether Goetz and McGill are seeking to proceed on this claim in a representative capacity.

directors, contending that each individual defendant is liable as an "employer." Plaintiffs have also brought breach of contract, fraud, and theft claims against all the Synthesys-related defendants, including the individual directors.[2]

One of the individual directors sued by the two Plaintiffs is G. Walter Loewenbaum. Loewenbaum is also a client of Personal Administrators.[3]

### III.    Personal Administrators became involved when Goetz, knowing that she was about to sue one of its clients, interviewed for and accepted a position there.

Personal Administrators administers its clients' finances, or in the language used in Goetz's complaint, it manages individuals' assets. Put differently, Personal Administrators serves as its clients' home offices.[4] As part of this business, Personal Administrators pays its clients' bills, receives their mail, reconciles their accounts, addresses their trust and estate issues, and files their tax returns, among other functions.[5] To do this work, Personal Administrators maintains extensive personal financial files and records for its clients.[6] The office is small, and nothing prevents an employee from accessing any part of it.[7] Thus, a Personal Administrators employee would have a great deal of access to personal documents of clients, such as Loewenbaum and his family.[8]

For Personal Administrators to be successful, its clients must trust the company and must trust that its employees have the clients' best interest at heart.[9] Because trust is

---

[2] Plaintiffs are also asking to have a non-exclusive license to Synthesys' technology declared a fraudulent transfer.
[3] Ex. A, O'Meara depo. at 12:24-13:1.
[4] Ex. A, O'Meara depo. at 11:8-13.
[5] Ex. A, O'Meara depo. at 10:12-25.
[6] Ex. B, O'Meara declaration.
[7] Ex. A, O'Meara depo. at 71:12-72:9.
[8] Ex. A, O'Meara depo. at 55:7-58:20.
[9] Ex. B, O'Meara declaration.

so critical, employees are required to sign a confidentiality agreement,[10] and the Personal Administrators' Employee Policy Handbook prohibits conflicts of interest between its employees and clients.[11]

Personal Administrators' first contact with Goetz occurred in late 2000 or early 2001 when a Personal Administrators' employee, Cyndee Rust, called Goetz, who was the office manager at Synthesys, to obtain some information about a loan Loewenbaum made to Synthesys.[12] At that time, according to Goetz, Rust told Goetz that she "maintained the personal – some personal finances for Mr. Loewenbaum."[13]   Rust periodically called Goetz about those loans.[14]

When Rust called Synthesys about some information relating to Loewenbaum in late January 2002, she and Goetz discussed Synthesys' financial difficulties.[15]   During that discussion, they talked about Goetz's need to find new employment.[16] Personal Administrators had a job opening, and after meeting with her staff, O'Meara asked Rust to call Goetz and ask for her resume.[17]

Knowing that Loewenbaum was a client, Stephanie Goetz sent her resume to Personal Administrators in late January 2002.[18]   At that time, she also knew that she was about to sue Loewenbaum.[19]   Throughout the application and interview process, Goetz

---

[10] Ex. B, O'Meara declaration.
[11] Ex. C at p. 8-9.  Goetz is expected to emphasize the limited nature of the two specific examples of conflicts listed in the handbook.  Although the handbook does not list suing a client as a conflict, it does show that conflicts are prohibited and that "[t]he integrity of our relationship with our clients is of the utmost importance to our business."  *Id.*
[12] Ex. D, Goetz depo. at 53:25-54:8.
[13] Ex. D, Goetz depo. at 54:20-21.
[14] Ex. D, Goetz depo. at 55:21-24.
[15] Ex. D, Goetz depo. at 57:23-58:2.  Although the parties' testimony conflicts about who informed Personal Administrators about Synthesys' problems, this dispute is not material.
[16] Ex. A, O'Meara depo. at 30:6-11.
[17] Ex. A, O'Meara depo. at 33:11-34:14.
[18] Ex. D, Goetz depo. at 58:19-20.
[19] Ex. D, Goetz depo. at 67:12-20.

never shared this conflict of interest with anyone at Personal Administrators.[20] Goetz

applied for and accepted a job in which her role was to administer the finances and other

personal items of clients,[21] all the while knowing that she was preparing to sue one of

them.[22]

In fact, this suit was filed on Wednesday, February 6, 2002, Goetz's second day at

Personal Administrators.[23]   Loewenbaum was served on Wednesday and promptly

contacted Personal Administrators.[24]   Loewenbaum informed Personal Administrators

that Goetz had sued him and that he was particularly concerned about the confidentiality

of his personal records.[25] He had been to the Personal Administrators' facility and knew

that it was a relatively small business with little internal security.    Personal

Administrators' office did not have separate locks inside the building, and there was no

feasible way to isolate Loewenbaum's documents from those belonging to other clients.[26]

---

[20] Ex. D, Goetz depo. at 67:17-68:1.

[21] Goetz has testified that she accepted the job and began working at Personal Administrators without having much knowledge of what the company did, other than general bookkeeping for clients. (Ex. D, Goetz depo. at 66:15-67:3; 73: 7-24)   Although O'Meara and Personal Administrators have evidence to the contrary, including other instances of Goetz's testimony (Ex. D, Goetz depo. at 54:2-23; 55:15-18), they accept that, for purposes of this motion, the Court must accept Goetz's testimony as true. Goetz has not, however, disputed that she knew that Loewenbaum was a client or that she knew she was going to sue him when she accepted the job.

[22] Ex. D, Goetz depo. at 67:12-20.

[23] Goetz's pleadings state that the suit was filed on February 5, but the date stamp indicates it was filed on February 6.

[24] Ex. A, O'Meara depo. at 52:5-10.

[25] Ex. E, Loewenbaum depo. at 128:12-16.  Loewenbaum knew that Personal Administrators had hired Goetz because Personal Administrators had left him a message during the application process. (Ex. E, O'Meara depo. at 50:5-16.) Goetz and O'Meara disagree about whether Loewenbaum spoke to anyone at Personal Administrators about Goetz before she was hired.   This dispute is not material to the issues in this motion.

[26] Ex. A, O'Meara depo. at 59:13-60:16.

More importantly, there was no feasible way to isolate those documents from Goetz.[27]

Once the conflict became known, O'Meara placed Goetz on a paid leave of absence while she decided how to proceed.[28] After spending several days trying to find a solution, O'Meara determined that there was no reasonable way to keep Goetz separated from Loewenbaum's personal documents.[29] Goetz was fired on February 12, 2002, and even though she has agreed that their concerns about client confidentiality were reasonable,[30] she amended her lawsuit to include claims against O'Meara and Personal Administrators. Goetz created a situation in which O'Meara and Personal Administrators had no real choice but to fire her. Having created the situation where her termination was necessary, Goetz then sued O'Meara and Personal Administrators for doing just that.

In her First Amended Complaint, Goetz has pleaded four claims against O'Meara and Personal Administrators: retaliation, conspiracy to retaliate, conspiracy to tortiously interfere with contractual relations,[31] and civil conspiracy. O'Meara and Personal Administrators move for summary judgment on all the claims against them.

---

[27] Even Goetz testified, after originally claiming that she did not have access to Loewenbaum's accounts, (Ex. D, Goetz depo. at 79:14-17) that the only thing keeping her from accessing those accounts was that "[v]erbally, I was informed that you should not be accessing and/or viewing other accounts that you were not currently working on or should not have access to." (Ex. D, Goetz depo. at 81:15-18.) She admitted that she was not aware of anything that would physically keep her from Loewenbaum's accounts. (Ex. D, Goetz depo. at 81:19-22.) And in fact, after the temporary fix of password protecting and locking his files, Goetz would still have access to Loewenbaum's "bank statement[s], investment reports, income tax returns, all the information that it takes to pull an income tax together, the 1099s, the K-1s." (Ex. A, O'Meara depo. at 54:22-55:2)

[28] Ex. A, O'Meara depo. at 79:2-7.

[29] Ex. A, O'Meara depo. at 80:5-9.

[30] Ex. D, Goetz depo at 79:8-14.

[31] Although Goetz's tortious interference claim, as opposed to her conspiracy to tortiously interfere claim, only includes allegations against Loewenbaum, her prayer includes a request for judgment against O'Meara and Personal Administrators for tortious interference. As described in greater detail later, Goetz cannot establish a tortious interference with contract claim against O'Meara or Personal Administrators because the contract she is suing over was with Personal Administrators. A company cannot tortiously interfere with its own contract.

IV.  **O'Meara and Personal Administrators cannot be liable for conspiring to interfere with Goetz's employment contract with Personal Administrators.**

Under Texas law, a company cannot be liable for tortiously interfering with its own contracts. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). Furthermore, a company's agent, such as O'Meara, cannot be liable for interfering with the company's contracts unless the agent acts to further her own personal interests and not the company's. *Id.* at 796. Goetz has not alleged that O'Meara was furthering her own interests, nor can she point to evidence creating a fact issue on this point.[32] If Personal Administrators and O'Meara cannot be liable for interfering with Goetz's contract with Personal Administrators, they logically cannot be liable for conspiring to interfere with that contract. Yet, this is exactly what Goetz seeks to do with her conspiracy to tortiously interfere with contract claim.

Conspiracy does not create liability where there is no liability for the underlying substantive tort. *See Sanchez v. Liggett & Myers, Inc.*, 187 F.3d 486, 491 (5th Cir. 1999) (plaintiffs could not pursue a conspiracy claim against defendants who were involved in the tobacco industry but who did not manufacture cigarettes because these defendants had no underlying tort liability); *Schoellkopf v. Pledger*, 778 S.W.2d 897, 900 (Tex. App. – Dallas 1989, writ denied) ("an actionable conspiracy must consist of wrongs that would have been actionable against the conspirators individually"). Conspiracy thus essentially serves as a method of establishing joint and several liability. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979). In this case, as a matter of law, neither O'Meara nor Personal Administrators could be liable for tortiously interfering

with this contract. They, therefore, cannot be liable for conspiring to tortiously interfere with the contract.

This exact issue was addressed in *Golden v. Daiwa Corp.*, 2000 WL 251736 at *3 (N.D. Tex. 2000), in which Judge Lindsay of the Northern District of Texas ruled that a plaintiff could not state a claim for conspiracy to tortiously interfere with contract against a defendant who was a party to the contract. Judge Lindsay's reasons were the same as the reasons argued in this motion: if a party cannot be liable for tortiously interfering with its own contract, it cannot be liable for conspiring to tortiously interfere with it. *Id.*

This principle is further illustrated by an examination of the elements of conspiracy. For a defendant to be liable for a conspiracy, a plaintiff must prove, among other things, that the defendants agreed to "accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). For O'Meara and Personal Administrators, "interfering" with Goetz's at-will employment contract was not unlawful, either in terms of its purpose or in terms of its means.[33]

Goetz may be expected to point to some caselaw from Texas intermediate courts as support for this claim. *See Boyles v. Thompson*, 585 S.W.2d 821 (Tex. App. – Fort Worth 1979, no writ); *Cox v. Process Eng'g, Inc.*, 472 S.W.2d 585 (Tex. App. – Amarillo 1971, no writ). These cases suggest that a party to a contract could be liable for

---

[32] Goetz has not alleged that O'Meara had any personal interest in "interfering" with the contract. In fact, Goetz's pleadings state that O'Meara fired her because "Loewenbaum is a major client of Personal Administrators." (Plaintiffs' First Amended Collective Action Complaint at ¶ 23.)

[33] Furthermore, permitting this claim in this context would be contrary to Texas' policy of at-will employment. Under Texas law, an employer can generally fire an employee for any reason or for no reason at all. *Texas Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 608 (Tex. 2002). Although a third-party can be liable, under certain circumstances, for tortious interference with an at-will employment contract, making an employer liable for conspiring to tortiously interfere with contract simply for firing an employee would undermine the principles of at-will employment.

conspiracy to interfere with it. This caselaw, however, predates *Holloway* and entirely contradicts its principles. In light of *Holloway* and the concepts underlying liability for a conspiracy, these earlier cases do not represent Texas law.

In short, Goetz's attempts to expand liability for tortious interference should fail. In *Holloway*, the Texas Supreme Court warned that by allowing a tortious interference claim when there was an identity of interest between the alleged tortfeasor and the breaching party, "any party who breaches a contract could be said to have induced his own breach and would therefore be liable for tortious interference. Such logic would convert every breach of contract claim into a tort claim." *Holloway,* 898 S.W.2d at 795. Here, Goetz is seeking to do the same thing by giving the idea a different name -- conspiracy. The problems recognized in *Holloway* exist regardless of whether the claim is labeled as tortious interference or conspiracy to tortiously interfere. The results should be the same, as well.

Therefore, because O'Meara and Personal Administrators could not be liable for tortiously interfering with Goetz's employment contract, summary judgment should be granted on Goetz's conspiracy to tortiously interfere with contractual relations claim and on Goetz's separate civil conspiracy claim to the extent that this claim is based on tortious interference with contract.

**V.      O'Meara and Personal Administrators had a legitimate, non-retaliatory reason for firing Goetz: Goetz's conduct, when analyzed under a balancing test, is not protected.**

Contrary to Goetz's interpretation, the FLSA's retaliation provision does not provide her with any absolute rights or entitlements. Under Goetz's theory of the FLSA, because her actions are completely protected, she can put an innocent business owner in a

position of choosing between losing a client who has legitimate concerns about Goetz's access to his financial records or being sued for retaliation. Under her interpretation of the law, it does not matter that both her loyalties to her new employer's clients and her honesty are seriously in doubt. Under her theory, likewise, O'Meara's reasonable concerns about privacy – and Goetz has agreed that those concerns are indeed reasonable – are irrelevant. Thus, according to Goetz, only her interests are protected, and they are protected absolutely.

But like other interests, Goetz's interests are not entitled to absolute protection; rather, they are subject to balancing. In this case, when Goetz's interests are balanced against her employer's interests, the results lean in favor of her employer. Because the FLSA does not require an innocent business owner to employ someone who interferes with the business' ability to function, O'Meara and Personal Administrators are entitled to summary judgment on Goetz's claims for retaliation under the FLSA.[34]

### A.     Retaliation and balancing

The FLSA prohibits retaliation against a person who has filed a complaint about wages or overtime payment. 29 U.S.C. § 215(a)(3). Courts have analyzed claims under this provision similarly to Title VII retaliation claims and have applied the *McDonnell Douglas* burden-shifting analysis. *See, e.g., Conner v. Schuck Markets*, 121 F.3d 1390, 1394 (10th Cir. 1997); *Hashop v. Rockwell Space Operations Co.*, 867 F. Supp. 1287, 1299 (S.D.Tex. 1994). Under this analysis, a plaintiff must establish a prima facie case, that is, that she engaged in protected activity, that she suffered an adverse employment action, and that there was some causal connection between the protected activity and the

adverse employment action.  *Conner*, 121 F.3d at 1394.   Once the plaintiff has established her prima facie case, the burden of production then shifts to the employer to state a legitimate, non-discriminatory reason for the action.  *Id*.  The burden then shifts again to the plaintiff to present evidence that the stated reason was pretext.  *Id*.

Although the Fifth Circuit has not decided this issue in the FLSA context, it is clear from Title VII cases that not all opposition to prohibited employment practices is protected by laws against retaliation.   *See Douglas v. DynMcDermott Petroleum Operations Co.*, 114 F.3d 364 (5th Cir. 1998); *Jones v. Flagship Int'l*, 793 F.2d 723, 728 (5th Cir. 1986); *Rosser v. Laborers' Int'l Union of North America, Local No. 438*, 616 F.2d 221, 233 (5th Cir. 1980) ("[e]ven though opposition to an unlawful employment practice is protected, such protection is not absolute"). Conduct that greatly interferes with the employee's job performance and renders her ineffective at her job falls outside the law's coverage. *Rosser*, 616 F.2d at 223.  In the Title VII context, the Fifth Circuit has established a balancing test to determine whether conduct that might otherwise be protected falls outside the law's scope. *Jones*, 793 F.2d at 728. If conduct is not protected, then the employer has a legitimate, non-retaliatory reason for taking its actions.[35]  *Id*.

Under the Fifth Circuit Title VII balancing test, "the employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare." *Jones v. Flagship Int'l*, 793 F.2d 723, 728 (5th Cir. 1986) (quoting *Jeffries v. Harris County Cmty. Action Assoc.*, 615 F.2d 1025, 1036 (5th Cir.

---

[34] Goetz claims both retaliation under the FLSA and conspiracy to retaliate under the FLSA.  Her general civil conspiracy claim might cover this conduct as well.  For simplicity, O'Meara and Personal Administrators refer to the retaliation and conspiracy to retaliate claim as one retaliation claim.

1980)).   This test also requires an employee's conduct to be reasonable under the circumstances.  *Id.*  In several cases, the Fifth Circuit has applied this test and has held in the employer's favor.

In the most recent of these cases, *Douglas v. DynDermott Petroleum Operations, Co.*, 114 F.3d 364 (5th Cir. 1998), the Fifth Circuit held that a former in-house attorney's disclosure of information about discrimination complaints, even if done in opposition to unlawful employment practices, was unprotected.  In reaching this decision, the court commented that "some conduct, even though engaged in with the most sincere of intentions, may be so inappropriate as to justify the curtailment of statutorily-protected safeguards."  *Douglas*, 144 F.3d at 373.    Although much of the opinion specifically addresses an attorney's ethical obligations, *Douglas* stands for the principle that conduct that interferes with an employee's position, particularly with her position of trust, is not necessarily protected by employment laws.

Similarly, the balancing test in *Jones v. Flagship International*, 793 F.2d 723 (5th Cir. 1986) came out in favor of the employer.  *Jones*, too, involved an in-house attorney whose job duties involved representing the employer in front of the EEOC.  *Jones*, 793 F.2d at 716.  Jones was fired after filing a charge of discrimination against her employer and asking other employees to join her.  *Id.* at 717.  The court analyzed the reasons for her termination, which were "not only the conflict of interest stemming from her position as an EEO officer, but [also] Jones' plan to initiate a class action suit against the company."  *Id.* at 726.  Jones' actions, in light of her position, were not protected when

---

[35] For purposes of this motion only, O'Meara and Personal Administrators will concede that Goetz can establish a fact question on her prima facie case.

balanced against her employer's interests. *Id.* at 728. Therefore, the employer had a legitimate, nondiscriminatory reason for its actions. *Id.*

The same balancing test used in Title VII cases should be applied to this FLSA retaliation case. The considerations that underlie balancing in the Title VII cases are equally relevant to the FLSA.[36] While not contesting the significance of an employee's ability to file a complaint under either statute, an employer must be able to run its business, and under some circumstances, this interest should outweigh its employee's interests.

## B.    Applying the balancing test

The balancing test's elements favor O'Meara and Personal Administrators. To begin with, all the parties agree that O'Meara's, Personal Administrators' and Loewenbaum's concerns about the privacy of personal records were reasonable. Goetz has testified that this was the case.[37] With the unlimited access provided by her job, Goetz could find out much more information about Loewenbaum by examining his personal files than would likely be permitted under the discovery rules. And nothing would prevent her from using information she obtained while working at Personal Administrators. [38]

Moreover, Personal Administrators' business largely depended upon its clients' trust.[39] By suing one of those clients, Goetz interfered with that trust. *Cf. Douglas*, 144 F.3d at 375 (noting that the plaintiff's conduct had destroyed the trust required for her to

---

[36] Admittedly, like Title VII, the FLSA is liberally interpreted in favor of its goals. *Donovan v. I-20 Motels, Inc.*, 664 F.2d 957, 958 (5th Cir. 1981). It should not be so liberally interpreted, however, as to ignore an employer's legitimate concerns.
[37] Ex. D, Goetz depo. at 79:8-14.
[38] Goetz, in fact, removed documents from Synthesys and gave them to her lawyer in violation of her confidentiality agreement with Synthesys. (Ex. D, Goetz depo. at 120:5-21.)
[39] Ex. B, O'Meara declaration.

perform her job).  Even though she was not hired to handle Loewenbaum's finances, Goetz's untrustworthiness meant that she was ineffective at the job she was hired to perform.

Further, Personal Administrators likely would have lost Loewenbaum as a client unless there was some way to isolate Goetz from his records.[40]  The evidence is undisputed that there was no way to do this.[41]  An employer should not have to lose a client to protect a new employee who applied for work knowing that she was going to sue that client.

Additionally, O'Meara and Personal Administrators were clearly innocent of any wrongdoing at Synthesys.  It is undisputed O'Meara and Personal Administrators had nothing to do with the alleged non-payment of wages at Synthesys.  This lack of involvement in the underlying acts makes this an even more compelling case for finding employee conduct unprotected than cases -- such as *Jones*, *Douglas*, and *Rosser* -- in which the entity or person who fired the employee was also the entity or person whose conduct was being protested.  O'Meara and Personal Administrators did not chose to get involved in a wage dispute between Goetz and Synthesys.  Rather, Goetz decided to pull them in by applying for and accepting the job.

On the other hand, Goetz's rights to express her grievances and promote her own welfare would not be particularly hindered by finding her conduct unprotected.  It is difficult to imagine that anyone would be discouraged from coming forward with a complaint simply because they knew that they might not later be able to find employment at a company that manages an individual defendant's finances.  This is not a situation in

---

[40] Ex. E, Loewenbaum depo. at 134:15-20.
[41] Ex. A, O'Meara depo. at 59:13-60:16.

which someone associated with a former employer is trying to prevent Goetz from obtaining any employment; there is no allegation (nor would such an allegation have any support) that Loewenbaum, O'Meara or Personal Administrators attempted to interfere with her ability to obtain any job outside of Personal Administrators.   A ruling in O'Meara and Personal Administrators' favor would only mean that factors other than protection of an employee's right to file a FLSA lawsuit are relevant in this particular situation.

Finally, Goetz will have difficulty arguing that her conduct in applying for and accepting a job with Personal Administrators was reasonable under the circumstances. As in *Jones*, *Rosser*, and *Douglas*, Goetz's conduct put her employer in a bind.   The undisputed evidence establishes that:

1.   Goetz knew that Loewenbaum was a Personal Administrators client.[42]

2.   Goetz knew that Personal Administrators handled Loewenbaum's finances. [43] Goetz's first contact with Personal Administrators occurred when a Personal Administrators employee called for some information on a loan Loewenbaum made to Synthesys.[44]   Goetz testified that, after asking about the employee's authority to get the information, the employee "said that she maintained some personal finances for Mr. Loewenbaum."[45]

3.   Goetz knew when interviewing and accepting the job that she was going to sue Loewenbaum.[46]

---

[42] Ex. D, Goetz depo. at 67:4-8.
[43] Ex. D, Goetz depo. at 55:15-18.
[44] Ex. D, Goetz depo at 54:3-8.
[45] Ex. D, Goetz depo. at 54:14-23.
[46] Ex. D, Goetz depo. at 67:12-20.

4.     During her interview, Goetz never revealed her intention to sue Loewenbaum.[47]

5.     Goetz accepted the job offered at Personal Administrators and never informed her new employer of the conflict of interest presented by her suit against their client, Loewenbaum.

In short, knowing that she was about to sue Loewenbaum, Goetz applied for a job at a small company that she was aware, at the very least, had some involvement with his personal finances. This is not the kind of reasonable behavior that the FLSA should protect.

Goetz's interests, then, when balanced against O'Meara's and Personal Administrators' interest in running a business, come up short. Goetz applied for a job knowing the conflict her employment would cause. In contrast, at the time Goetz was hired, O'Meara and Personal Administrators had no idea that Goetz was about to sue one of their clients. Once the lawsuit was known, O'Meara attempted to devise a solution that would both keep Goetz employed and simultaneously protect her client. O'Meara decided to let Goetz go only when it became clear that Goetz's continued employment would create an insurmountable problem. Goetz created a problem that O'Meara tried her best to resolve. Because of this problem, Goetz simply could not perform her job.

Based on this balancing, O'Meara and Personal Administrators had a legitimate, non-retaliatory reason for firing Goetz. Goetz can present no evidence of pretext. O'Meara and Personal Administrators are entitled to summary judgment on Goetz's retaliation claim.

---

[47] Ex. D, Goetz depo. at 67:21-68:1.

**VI.    O'Meara and Personal Administrators are entitled to summary judgment on Goetz's conspiracy claim because Goetz has no evidence of any unlawful act that violated her state or federal rights.**

Goetz's complaint includes a separate civil conspiracy count, which states only that Loewenbaum, O'Meara, and Personal Administrators conspired to violate Goetz's state and federal rights.  The complaint provides no further specifics.  To the extent that this claim is separate from Goetz's claim for conspiracy to tortiously interfere with contract and claim for conspiracy to retaliate, O'Meara and Personal Administrators are entitled to summary judgment on it.[48]

Goetz has alluded to two other possible conspiracy allegations.  In her deposition, Goetz alleged that the parties conspired to violate her right not to be spoken to by an attorney without her own counsel present.[49]  She also testified that the conspiracy claim involves discussions between Loewenbaum and Personal Administrators about Goetz's lawsuit.[50]  Neither of these allegations can support a conspiracy claim.  Even if it were a violation of an attorney's ethical obligations,[51] speaking to a represented person without her lawyer present would hardly be an actionable violation of state- or federally-protected rights.  *See* Tex. Disciplinary Rules of Professional Conduct Preamble: Scope at ¶ 15 ("[v]iolation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached").  Without an unlawful act, there can be no conspiracy liability.  *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).  Likewise, discussing Goetz's lawsuit would not, by itself, be unlawful.

---

[48] For the reasons discussed above, Goetz's claims of conspiracy to tortiously interfere and to retaliate must fail.

[49] Ex. D, Goetz depo. at 86:22-87:2.

[50] Ex. D, Goetz depo. at 86:3-87:21.

[51] O'Meara and Personal Administrators are not conceding that this conversation violated any ethical duties.

Goetz has not alleged a violation of any other rights.   Thus, O'Meara and Personal Administrators are entitled to summary judgment on Goetz's civil conspiracy claim.

## VII.    Conclusion

For these reasons, Defendants Patti O'Meara and Personal Administrators ask this Court to grant summary judgment on their favor on all of Plaintiff Stephanie Goetz's claims against them.

Respectfully submitted,

By _Rebecca S. Smith_

Gary L. Lewis
State Bar No.12277490
Rebecca S. Smith
State Bar No. 24013535
1100 Norwood Tower
114 West Seventh Street
Austin, Texas 78701
Tel. (512) 495-1400
Fax  (512) 499-0094

OF COUNSEL
GEORGE & DONALDSON, L.L.P.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing DEFENDANTS O'MEARA AND PERSONAL ADMINISTRATORS' MOTION FOR SUMMARY JUDGMENT has been sent to counsel of record as indicated:

> J. Derek Braziel
> David George                                    *via* First Class Mail
> EDWARDS & GEORGE, L.L.P.
> 8080 N. Central Expressway, Suite 400
> Dallas, Texas 75206
> Phone: 214) 749-1400
> Fax: (214) 749-1010
>
> John Bucy                                       *via* First Class Mail
> 701 Brazos, Suite 500
> Austin, Texas 78701

on this the ___21 st___ day of February, 2003.

*Rebecca S. Smith*
Rebecca S. Smith

PATTI O'MEARA

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3    STEPHANIE GOETZ and        )   CIVIL ACTION NO.
      KEVIN McGILL,              )       A-02-CA-081-JN
 4    Individually and on Behalf )
      of All Other Similarly     )   JURY TRIAL DEMANDED
 5    Situated,                  )
      Plaintiffs,                )
 6                               )
      v.                         )
 7                               )
      SYNTHESYS TECHNOLOGIES,    )   Judge Nowlin
 8    INC., ET AL.,              )
      Defendants.                )   COLLECTIVE ACTION
 9
10       *******************************************
                     ORAL DEPOSITION OF
11                      PATTI O'MEARA
                     NOVEMBER 20, 2002
12       *******************************************
13
14
15
16
17       ORAL DEPOSITION of PATTI O'MEARA, produced as a
18    witness at the instance of the Plaintiff, and duly
19    sworn, was taken in the above-styled and numbered cause
20    on the 20th day of November, 2002, from 3:13 P.M. to
21    5:41 P.M., before Leanna Lynch, CSR, in and for the
22    State of Texas, reported by machine shorthand, at the
23    offices of George & Donaldson, 114 W. 7th Street, Suite
24    1100, Austin, Texas, pursuant to the agreements stated
25    on the record and the Texas Rules of Civil Procedure.
```

EXHIBIT

A

ORIGINAL

1e48df0b-e15a-457b-9321-3c13b7541f94

PATTI O'MEARA

1    foundation work -- charitable work, and one part-time

2    person, that is also a CPA, that backs up Qian.  And

3    then the last person is a lady who is trained in

4    investments, and she handles the reporting of all of our

5    clients' investments.

6        Q.    Okay.  The client managers, what do they do?

7        A.    They deal with the daily functions that are

8    needed by our clients, conduct meetings.

9        Q.    Anything else, besides daily functions and

10   conducting meetings?

11       A.    Well, that just takes up all day.

12       Q.    Okay.  What are the daily functions?  Give me

13   an idea.

14       A.    An idea would be a client would come in, and

15   you would have received their mail, you would have paid

16   their bills, you would have reconciled their account.

17   They might have some estate planning issues that you're

18   going over with them, they may have -- the investment

19   reports maybe have come out, and you make them aware of

20   the accounts, to see if they have too much risk, or

21   they've lost a lot of money.  There is different

22   criteria that we look at if it is a trust or an estate,

23   so the daily lives of the clients dictate.  This time of

24   year, our clients are really focused on family giving

25   and donations.

PATTI O'MEARA

 1      Q.    Family giving and donations.  What is family

 2  giving?

 3      A.    They give their family gifts.

 4      Q.    I'm sorry, I didn't know what that was.  I

 5  guess trying to get away from the tax laws toward this

 6  time of year, or comply with them as it were?

 7      A.    That's right.

 8      Q.    Okay.  So how would you describe what Personal

 9  Administrators does?  What is their function?

10      A.    That has always been a really difficult

11  question for me, because it is so wide, and has such a

12  broad spectrum.  For lack of a better word, we serve as

13  their home office.  Most of our clients could have an

14  office, and we just fill that position.

15      Q.    How many different clients do you have?

16      A.    You would have to describe what different is.

17      Q.    Different individuals, I mean, people that you

18  do business for.  And let me use the example, if they're

19  different companies, but all owned by the same person,

20  the different companies.  I'm just trying to get a feel

21  for the number of different entities that you do

22  business for?

23      A.    How we describe it, is we have relationships.

24  And under those relationships, we'll have maybe eight or

25  ten different entities that we deal with.  So as far as

PATTI O'MEARA

Page 12

1    relationships, we have a little over a hundred.

2        Q.    And for each of the relationships, then there

3    may be eight to ten entities that you deal with?

4        A.    Exact opposite of what you just said.

5        Q.    Oh, I'm sorry.  Okay.

6        A.    That's all of the entities that we deal with.

7    And the number of people that we deal with is less than

8    a hundred.

9        Q.    Okay.  So you have eight to ten broad-based

10   relationships?

11       A.    Probably about 40 broad-based relationships

12   that equate to a hundred entities that we will deal

13   with.  An entity must have a tax return filed.

14       Q.    Tell me what you mean by that -- an entity must

15   have a tax return filed.  In order for you to count them

16   as one of your hundred?

17       A.    Right.  Correct.

18       Q.    Okay.  Like I said, we may be using some terms

19   you're more familiar with, so I don't want to assume

20   what you mean.  So then, and just so I want to be

21   clear, you have a hundred entities, a hundred different

22   folks you file tax returns for?

23       A.    Correct.

24       Q.    Okay.  Your company does work for Walter

25   Loewenbaum?

PATTI O'MEARA

1      A.    Correct.

2      Q.    Okay.  How many different entities for Mr.

3    Loewenbaum?

4      A.    I don't know.

5      Q.    Rough estimate?

6      A.    Ten to twelve.

7      Q.    I assume, and correct me if I'm wrong, that you

8    do administration for the individual, as well as a

9    company that that individual might own?

10      A.    Correct.

11      Q.    Okay.  So these entities we're talking about

12    could either be individuals or companies, right?

13      A.    Correct.  Or they could be a trust or an

14    estate.

15      Q.    Or a trust or an estate.  Okay.  So would it be

16    fair to say that Mr. Loewenbaum -- of the number of

17    entities you have, has 10 to 12 percent of your client

18    base -- or represents 10 to 12 percent?

19      A.    No, he does not represent 10 percent.

20      Q.    Okay.  If you had a hundred entities and he has

21    10 to 12 of them, how is that not 10 percent?

22      A.    Well, an entity may be very, very small.  It

23    may be a trust that has two or three transactions a

24    month.  We don't label them by their net worth, but more

25    by the activity.  How much time it takes us to do the

1e48df0b-e15a-457b-9321-3c13b7541f94

1    needs dovetail with what we offer.

2         Q.   Okay.  Do you advertise in the phone book?

3         A.   No, I do not.

4         Q.   Probably listed, but --

5         A.   I'm listed, but I do not have an ad.

6         Q.   -- not a separate ad.  Okay.  How did Stephanie

7    Goetz come to you, as far as applying for a job?

8         A.   She had visited with one of our client

9    managers, and had mentioned that her job was in

10   jeopardy, and that she might -- that she had gotten

11   permission to look for other employment.  And she had

12   been very cooperative and bright on the phone, and so we

13   had someone that we were not pleased with, and we

14   decided that we were going to start looking for someone,

15   and then she came to mind.

16              MR. LEWIS:  Just be careful and just

17   answer the question.

18              THE WITNESS:  Okay.

19              MR. BRAZIEL:  Mr. Lewis, she was doing

20   fine.  I asked how she came to her.

21              MR. LEWIS:  She told you a lot more than

22   that.

23              MR. BRAZIEL:  No, I don't coach my

24   witnesses.

25        Q.   (BY MR. BRAZIEL)  You said you were about to

PATTI O'MEARA

1    Q.   Okay.  Just haven't had a need to fill it just

2    yet?

3    A.   Correct.

4    Q.   Okay.  So at the time Ms. Goetz applied -- I'm

5    talking about February, basically, of this year -- there

6    was a director of operations at the time?

7    A.   Correct.

8    Q.   Okay.  Any other positions that were there at

9    the time that we haven't gone over yet?

10   A.   No.

11   Q.   Okay.  So how did the conversation start with

12   you and Ms. Rust, as far as needing to fill a position?

13   Did you walk in and say, we need to fill a position?

14   How did that start?

15            MR. LEWIS:  Objection; form.

16   Q.   (BY MR. BRAZIEL)  You can answer.

17   A.   It was just around the table, that we just

18   needed to add a person.

19   Q.   When you say, around the table, what do you

20   mean?

21   A.   Our board room meeting table.

22   Q.   Do you have weekly meetings?

23   A.   No, we do not.

24   Q.   Was this an impromptu meeting, or was this a

25   meeting that you... -

PATTI O'MEARA

Page 34

1      A.   Impromptu.

2      Q.   What was the subject of the meeting?

3      A.   Hiring a new employee.

4      Q.   That would be how it came up, I suppose.  Were

5    there other names that were presented at the meeting for

6    potential people to fill the position?

7      A.   I don't think so, but I don't remember.

8      Q.   At the conclusion of the meeting, what was the

9    directive, as far as Ms. Goetz was concerned?

10     A.   To get her resume.

11     Q.   Who did you assign that task to?

12     A.   Cindy Rust.

13     Q.   Did she do it?

14     A.   She did.

15     Q.   What was the next step in the hiring process?

16     A.   An interview.

17     Q.   Do you remember when that was?

18     A.   It was in the first part of February, and it

19   was a Monday.  It was probably the first Monday in

20   February, whatever that date is.

21     Q.   Prior to the interview, you received her

22   resume; is that right?

23     A.   Correct.

24     Q.   Based on the resume, you invited her in for an

25   interview?

PATTI O'MEARA

Page 50

1    results?

2        A.   She did.

3        Q.   Okay.  What did she tell you?

4        A.   They were good.

5        Q.   Did you contact Mr. Loewenbaum to talk to him

6    about Ms. Goetz?

7        A.   We did.

8        Q.   Okay.  Why did you contact Mr. Loewenbaum?

9        A.   Wanted to see if he had worked with her, or

10   knew her at Synthesys, and his opinion.

11       Q.   Okay.  And tell me how that conversation went.

12       A.   We didn't reach him.

13       Q.   Oh, all right.  So you tried to call and you

14   just didn't get him?

15       A.   We left a message on his voice mail -- on his

16   cell phone.  He was out of the city.

17       Q.   Did he call you back?

18       A.   He did not call me -- oh, he called the

19   office -- yes.  He did call the office, but it was on a

20   business matter, and he was in a business meeting -- he

21   called us from a meeting, and so we just answered his

22   question and did what he requested of us and didn't

23   mention we had a voice mail in for him.

24       Q.   Okay.  Did not mention that you had a voice

25   mail?

PATTI O'MEARA

1      A.   No.

2      Q.   Did you leave a message?  Did someone leave a

3   message for him?

4      A.   We did leave a message.  Never heard back.

5      Q.   Never heard back.  When did you next talk to

6   Mr. Loewenbaum about Ms. Goetz?

7      A.   Let me think.  I don't remember the exact day.

8   She interviewed on Monday.  She started to work on

9   Tuesday.  I heard from -- the office heard from Wally,

10  and I heard about it late on Wednesday.

11     Q.   When you say, the office heard from Wally, what

12  do you mean?

13     A.   He called Cindy.

14     Q.   Did he actually reach Cindy or just leave her a

15  voice mail?

16     A.   He actually reached her.

17     Q.   Okay.  Did Cindy report that conversation,

18  then, to you?

19     A.   When I came in that day, she did.

20     Q.   Okay.  What did she tell you?

21     A.   She told me that Wally had received our voice

22  mail on his cell phone, and that he had a problem,

23  because he had just been sued with a lawsuit where

24  Stephanie was suing him.

25     Q.   Anything else you remember that Cindy told you

1    maintain the confidentiality of all of his records.

2        Q.    Okay.  Tell me, as best you can recall,

3    everything that he said.

4        A.    He said I received Cindy's voice mail, that you

5    wanted to know if I knew anything about a Stephanie

6    Goetz.  I did not, until I got home from my trip, and

7    she is suing me.

8        Q.    Anything else?

9        A.    No.

10        Q.    That he said?

11        A.    That was it.

12        Q.    Okay.  So 10 to 15 minute conversation, that's

13    all he said?

14        A.    And he said, I'm concerned about the

15    confidentiality of my records.

16        Q.    Okay.  And what did you then say?

17        A.    Well, we had taken some steps right then.  We

18    had removed his records from the public and password

19    protected them.  We had found keys, and had locked his

20    file drawers.  And other than that, he was exposed to

21    her seeing his records.

22        Q.    What other records would she have been able to

23    see, after you password protected and locked the file

24    drawers?

25        A.    Bank statement, investment reports, income tax

PATTI O'MEARA

1    returns, all the information that it takes to pull an

2    income tax together, the 1099s, the K-1s.

3        Q.   Okay.  What else?

4        A.   You know, just the functions of what Personal

5    Administrators does in the files that pertain to the

6    Loewenbaums.

7        Q.   How are they kept?  How are those files kept?

8        A.   Our active files are kept in file drawers, file

9    cabinets.  And then our tax records are kept in banker's

10   boxes with all the information in it and labeled.  Bank

11   statements are kept in file cabinets.  We use computer

12   checks, so those are in binders on a shelf.  The checks

13   are locked.  Deposits are out.

14       Q.   Deposits are out.  What does that mean?  Out in

15   the open, you mean?

16       A.   Out in the open.

17       Q.   Okay.

18       A.   Investment files are up in the investment room

19   in file cabinets, but they're not locked.

20       Q.   So Mr. Loewenbaum's files, for the various

21   entities that he had, were not centralized in any one

22   place?

23       A.   Correct.

24       Q.   Okay.  The active files were in file cabinets,

25   right?

PATTI O'MEARA

1      A.    Correct.

2      Q.    Okay.  Were those the ones that were locked?

3      A.    Those were the ones that were locked.

4      Q.    Okay.  The tax records that were in bank boxes,

5  where were they stored, physically, in the building?

6      A.    Upstairs in a tax room on shelves.

7      Q.    And how are they labeled for Mr. Loewenbaum?

8      A.    Loewenbaum, whatever year, and box one of

9  however many boxes for that year.

10     Q.    Are they in a room, like one big room, with

11  other boxes?

12     A.    Oh, absolutely.

13     Q.    Okay.  On shelves?

14     A.    On shelves.  And then they are out in the hall

15  on shelves.

16     Q.    Okay.  Do you have archived files for

17  Mr. Loewenbaum?

18     A.    What are archived files?

19     Q.    Ones that you don't keep on site, is what I'm

20  thinking about.

21     A.    At this point, no.  We had everything on site.

22     Q.    Okay.  At that point, did you have stuff off

23  site?

24     A.    I did not have anything off site.

25     Q.    Okay.  The room that the tax boxes for

PATTI O'MEARA

1    Mr. Loewenbaum were in, did it have a lock on the door?

2        A.    No.

3        Q.    As an employee, would Ms. Goetz have been able

4    to walk into that room and look through those records?

5        A.    Oh, absolutely.

6        Q.    You don't have to check in with anyone, or sign

7    in with anyone?

8        A.    You do not.

9        Q.    How about the bank statements that were in the

10   file cabinets?  Were those the file cabinets that were

11   locked?

12       A.    No, they were not.

13       Q.    The checks, you said, were locked, right?  But

14   the deposits were not?

15       A.    Uh-huh.  Correct.

16       Q.    Where are the deposits kept?

17       A.    We kept some on shelves by the -- in the file

18   room.

19       Q.    Are these just deposit slips showing...

20       A.    Deposit slips -- computerized deposit slips.

21       Q.    These aren't actual checks that a client might

22   have received that you were going to deposit, right?

23       A.    No, absolutely not.  No, those are all locked.

24       Q.    Okay.  Any other documents that we have talked

25   about -- or that Mr. Loewenbaum had with you-all, that

PATTI O'MEARA

1   we haven't talked about?

2       A.   Well, from time to time, we have stock

3   certificates, maybe a copy of the will, maybe a copy of

4   a trust.

5       Q.   Where were those kept?

6       A.   In our fireproof vault.

7       Q.   Did Ms. Goetz have access to the vault?

8       A.   She could have.

9       Q.   Did she at the time?

10      A.   She probably didn't know she did, but they're

11  open to all employees.

12      Q.   Is there a lock on the vault?

13      A.   There is a key.

14      Q.   Okay.  Did she have a key?

15      A.   No, there's the key for the whole office.

16      Q.   And the key for the whole office opens the

17  vault?

18      A.   Yes, it does.  Therein lies the reason for my

19  confidentiality agreement.

20      Q.   Simplicity of keys.  Now, the confidentiality

21  agreement, as I understand it, just requires that they

22  not disclose this information outside their involvement

23  with Personal Administrators; is that right?

24      A.   Correct.

25      Q.   This conversation with Mr. Loewenbaum, where

PATTI O'MEARA

Page 59

1   you were talking about him being exposed, what else was

2   said in that conversation?

3       A.   Well, it was a very short conversation, and it

4   was really to answer the question that I had posed, did

5   he know Stephanie Goetz.  And if so, what was his

6   impression.  So that was the purpose of his call.  The

7   second purpose of his call was because he was concerned

8   about all of these records that are throughout our

9   offices.

10      Q.   Okay.  Did he give you an impression of Ms.

11  Goetz?

12      A.   He did not know her.

13      Q.   Okay.  And with respect to his concerns about

14  the confidentiality of information that Personal

15  Administrators had, did he ask you to take additional

16  steps to segregate his data, or to lock it down in a way

17  that Ms. Goetz couldn't get to it?

18      A.   No, he didn't.  And I think it's because Wally

19  had been in our office, and it's an impossible thing to

20  do just by virtue of how we keep our files.

21      Q.   Impossible, or just hard?

22      A.   Impossible.

23      Q.   There would be no way to segregate Mr.

24  Loewenbaum's data out from all the records at Personal

25  Administrators?

PATTI O'MEARA

1      A.    No, there would not.

2      Q.    Why not?

3      A.    We wouldn't have a place to put them.  I mean,

4  there's not an available room where we could, number

5  one, put all his records, and number two, it would be --

6  it would work a hardship on us to perform our duties for

7  him if they weren't kept in the appropriate places for

8  other employees to use.  So if we pulled every piece of

9  paper that had the name Loewenbaum on it, and put it in

10 one room, it would make an impossible task for us to

11 perform in our duties.

12     Q.    You could still perform your duties, if you did

13 that, right?

14     A.    We could.  It would be very difficult.  And

15 we -- our fees are based on an hourly rate, and it would

16 be exorbitant and unreasonable.

17     Q.    Did you tell Mr. Loewenbaum -- well, did

18 Mr. Loewenbaum direct you to terminate Ms. Goetz?

19     A.    No, he did not.

20     Q.    Did he imply that you should terminate Ms.

21 Goetz?

22     A.    Did not.

23     Q.    What did he say about Ms. Goetz's continued

24 employment there?

25     A.    He did not say anything.  All he was concerned

PATTI O'MEARA

1    building?

2        A.   My personal office.

3        Q.   Okay.  I haven't been out there, so I'm trying

4    to get a picture for what you're talking about.  So

5    there's a key to your office, right?

6        A.   There's a key to my office, there's a key to

7    one of my client's offices -- and it's only because when

8    we moved in, those had locks on them.  I mean, it's not

9    for any specific reason.  And I think there's one other

10   door that locks -- it may be one of the upstairs

11   offices.

12       Q.   Are there any doors, internally, that are

13   locked routinely?  Not the external doors to get into

14   the building, but inside the building?

15       A.   Inside the building?

16       Q.   Right.

17       A.   The only things that are locked is our vault,

18   which is opened with a key by anyone, and there are two

19   drawers in my office that I have -- I'm the only person

20   that has the key to it.

21       Q.   Okay.  The checks?

22       A.   No, my personal files.

23       Q.   No, no.  I was asking about the checks you said

24   were locked up earlier.

25       A.   They are.  The keys are available to all

PATTI O'MEARA

1    employees.

2        Q.   Do they check the keys out, or are these the

3    keys you issue after 90 days?

4        A.   The only key we issue after 90 days is the key

5    to the office, to get in to the office.  All the other

6    keys are kept in the office, in various and sundry

7    places, where everyone accesses them during the day.

8        Q.   Like in someone's desk drawer?

9        A.   Right.

10       Q.   Okay.  I'm trying to get a feel for how it is

11   done.  I didn't know if they had to check out a key from

12   someone?

13       A.   No.

14       Q.   If you had kept Stephanie Goetz employed, do

15   you believe Mr. Loewenbaum would have kept his business

16   with you?

17              MR. LEWIS:  Objection; calls for

18   speculation.

19       A.   I doubt it.

20       Q.   (BY MR. BRAZIEL)  Is that what motivated you to

21   let Ms. Goetz go?

22       A.   No.

23       Q.   Did you terminate Ms. Goetz because she filed a

24   wage and hour lawsuit against Mr. Loewenbaum?

25       A.   No.

PATTI O'MEARA

 1    them separated.

 2        A.    Well, I just -- I remember that the only thing

 3    I had said to Stephanie was that I really wanted her

 4    employment to continue with us, and that I didn't know

 5    how I was going to address the situation.  And then I

 6    decided, on Thursday night, that I would put her on a

 7    paid leave of absence.

 8        Q.    So the meeting -- the two meetings that

 9    Thursday were just to talk about the issue?

10        A.    Talk about -- well, what had come to our

11    attention.  Absolutely.

12        Q.    Right.  So how did the meeting end, as far as

13    Ms. Goetz's employment.  Was she still employed with

14    you?

15        A.    She was still employed.

16        Q.    Okay.  And you told her you were going to go

17    think about it, or what did you say?

18        A.    I told her -- yes, that I just had to think

19    about it, and I put her on paid leave of absence.

20        Q.    Okay.  What happened next, regarding

21    Ms. Goetz's employment?

22        A.    She got six days of payment, and didn't work a

23    day.

24        Q.    All right.  Then what?

25        A.    Really, it was more in Judy's court, at that

PATTI O'MEARA

1   point, than it was mine.  And I know she and Wally had a

2   number of conversations, and I extended -- let's see,

3   that happened on Thursday, and I gave her Friday, and

4   then I went through the weekend, and I still had not

5   made a decision.  And then I extended the paid leave of

6   absence through Monday, and then Monday evening, you

7   know, I had exhausted all thoughts of how I could

8   segregate and keep confidentiality and decided to

9   terminate her, and we did so on Tuesday.

10      Q.   If you could have effectively segregated the

11  documents, would you have let her stay on?

12      A.   I don't think so.  It was causing such

13  disruption.  We are a service corporation.  We have a

14  job to do.  And it was so counter-productive -- so

15  disruptive, and so out of line of what we're all about,

16  that it just was not a fit.

17      Q.   How was Ms. Goetz informed that she would be

18  let go?

19      A.   Her attorney was sent a letter.

20      Q.   Did you review that letter before it went out?

21      A.   I did.

22      Q.   It was sent -- a letter by you, or by your

23  attorney?

24      A.   By Judy Osborn.

25      Q.   Okay.  Did anyone call Ms. Goetz to let her

## DECLARATION OF PATTI O'MEARA

| STATE OF TEXAS | § |
| COUNTY OF TRAVIS | § |

1. My name is Patti O'Meara. I am over 21 years of age, am of sound mind, and am otherwise competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, and they are true and correct.

2. I am the president of Personal Administrators. Both I, individually, and Personal Administrators have been named as Defendants in the lawsuit entitled *Stephanie Goetz and Kevin McGill, Individually and on Behalf of Others Similarly Situated v. Synthesys Technologies, Inc., et al.*, cause number A-02-CA-081-JN in the United States District Court for the Western District of Texas.

3. Personal Administrators administers its clients' finances and performs work for its clients relating to taxes, estates and trusts. It, in essence, serves as its clients' home offices -- paying their bills, receiving their mail, and reconciling their accounts. To do this work, Personal Administrators maintains extensive personal files for its clients.

4. For Personal Administrators to be successful, its clients must trust it and must trust that its employees have the clients' best interests at heart.

5. Personal Administrators requires all of its employees to sign a confidentiality agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 2/20/03

Patti O'Meara

**EXHIBIT**

B

# EMPLOYEE POLICY HANDBOOK

### PERSONAL ADMINISTRATORS, INC.

#### May, 2000



EXHIBIT NO. 1
1/14/02
G. Barker



EXHIBIT
C

# TABLE OF CONTENTS

INTRODUCTION                                               1
COMPANY MISSION STATEMENT                                  2

EMPLOYMENT POLICIES                                        3
    EQUAL EMPLOYMENT OPPORTUNITY                           3
    UNACCEPTABLE JOB PERFORMANCE                           3
    TERMINATIONS                                           4
    SUBSTANCE ABUSE                                        4
    DRUG AND ALCOHOL TESTING                               5
    SAFETY                                                 5
    HARASSMENT                                             6

COMPENSATION POLICIES                                      7
    JOB CLASSIFICATIONS                                    7
    OVERTIME                                               8
    EMPLOYEE PERFORMANCE EVALUATIONS                       8
    CONFLICT OF INTEREST                                   8
    WAGE AND SALARY REVIEWS                                9
    PAYROLL DEDUCTIONS                                     9
    PAY PERIOD                                             9
    PAYROLL ADVANCES                                       10
    WAGE GARNISHMENT                                       10
    SEVERANCE PAY                                          10
    EMPLOYMENT REFERENCES                                  11
    UNEMPLOYMENT COMPENSATION                              11

OPERATING POLICIES                                         12
    PURPOSE                                                12
    ETHICAL STANDARDS                                      12
    OPEN DOOR POLICY                                       12
    SUGGESTIONS AND CLIENT FEEDBACK                        12
    SMOKE-FREE WORKPLACE                                   13
    DRESS CODE                                             13
    WORK SCHEDULE                                          13
        Lunch Breaks                                       13
    ABSENTEEISM AND TARDINESS                              13
    COMMITMENT TO CONFIDENTIALITY                          14
    EMPLOYEE PRIVACY                                       14
    ELECTRONIC COMMUNICATIONS                              15



# TABLE OF CONTENTS

SECURITY SYSTEM AND PROCEDURES ... 15
TELEPHONE USAGE ... 15
POLITICAL ACTIVITY ... 16
SOLICITATION FOR OUTSIDE CAUSES ... 16
OUTSIDE EMPLOYMENT ... 16
POSTED NOTICES AND INFORMATION ... 17
PERSONNEL FILES ... 17
POSSESSION OF FIREARMS AND WEAPONS ... 17
IMPROPER PERSONAL CONDUCT ... 17

COMPANY BENEFITS ... 18
PAID TIME OFF ... 18
HOLIDAYS ... 19
VACATIONS ... 20
    Vacation Schedules ... 20
    Maximum Accrual ... 20
    Unused Vacation Time ... 20
    Additional Note ... 20
PAID PERSONAL DAYS ... 21
BEREAVEMENT ... 21
JURY DUTY ... 21
WITNESS DUTY ... 22
VOTING ... 22
LEAVES OF ABSENCE ... 22
PERSONAL OR MEDICAL LEAVES NOT ... 23
    REQUIRED BY LAW ... 23
MILITARY LEAVE ... 23

INSURANCE ... 24
ON-THE-JOB ACCIDENTS OR INJURIES ... 24
MEDICAL INSURANCE ... 24

# INTRODUCTION

This Employee Policy Handbook describes the employment policies, operating philosophy, and benefits provided for employees of our Company.

The Handbook is intended to give you a general overview of the Company and information regarding the Company's commitment to you and its expectations from you in return.

Because we operate in a dynamic environment, some policies and benefit programs currently in effect may be revised, suspended, or eliminated in response to business needs or changing legal requirements. You will be informed if there are any policy changes or additions.

We are constantly reviewing and evaluating our policies, to see which ones are working well and which ones should be changed. We ask for your input if you have any suggestions as to how our policies could be improved.

This Handbook gives a general summary of your benefits. Official documents (e.g., insurance plans) are on file with management. If there is ever any inconsistency between this summary and the official documents, the official documents will prevail.

Ask your supervisor if you have any questions about your benefits or any of the policies presented in this Handbook.

# COMPANY MISSION STATEMENT

1. To provide the highest possible quality and efficient services in our field.

2. To do everything possible to meet our clients needs in a timely, courteous, and helpful manner. To always remember that our clients are our life's blood and our reason for existence, that serving them is not an imposition on our time; it is the reason we are here.

3. To make a fair and reasonable profit so that the Company can continue to exist.

4. To provide a work environment that enables every employee to reach the highest possible level of professional and personal fulfillment.

5. Employees are expected to put forth maximum effort and initiative towards the performance of their jobs and the achievement of the Company's goals. The Company and its management will make every effort to provide working conditions that enable all employees to fulfill their personal needs and goals and to maximize their professional growth as a part of this Company.

6. We are dedicated to a process of constant improvement — continuously seeking ways to improve our operation with perfection and efficiency as our goal to better serve our clients. Management and employees will work together and will constantly seek new ideas and suggestions, from each other and from clients, to achieve this end.



2.



# EMPLOYMENT POLICIES

## EQUAL EMPLOYMENT OPPORTUNITY

This Company is dedicated to both the letter and the spirit of the equal opportunity employment laws. All applicants and all employees will be evaluated on the basis of their ability, competence, and performance of the essential functions of their positions.

There will be no discrimination on the basis of race, sex, national origin, religion, age 40 and over, disability, sexual orientation, marital status, or any other classification which may be protected by federal, state, or local laws.

In compliance with the Americans with Disabilities Act, we specifically offer equal opportunity for all employees or job applicants who may have a physical or mental disability. Such persons will be hired on the basis of their ability to perform the essential functions of the job in question. Likewise, their work will be evaluated on their performance of these essential functions. We will offer reasonable accommodation to individuals with disabilities, to the extent that Company resources allow without undue hardship.



As part of our equal employment policy, there will be no wage differentials based on gender, between men and women employed in the same establishment, on jobs that require equal skill, effort, and responsibility, and which are performed under similar working conditions.

## UNACCEPTABLE JOB PERFORMANCE

If there is a problem with an employee's performance, the supervisor is expected to give the employee oral counseling as to exactly what the problem is, where the performance is deficient, and what needs to be done to bring the performance up to the required standards. (This oral counseling may also be recorded in the employee's file for documentation purposes.)

If the required improvement is not achieved after a reasonable length of time, the employee will be given additional counseling and a written warning. This will be documented in the employee's personnel file.

If the required improvement is still not achieved, the next step will depend on management's judgment as to the action needed. The next action will be either termination, suspension, probation, or an additional warning, depending on the circumstances and the seriousness of the problem.

It is the Company's obligation to communicate its expectations and performance standards clearly to employees. It is the employee's obligation to meet these standards of performance. The above policies are established to ensure that employees understand what is expected of them and are given every opportunity to meet these expectations.



In exceptional cases of misconduct that is clearly contrary to Company policy or threatening to the well-being of the Company, its clients or fellow employees, disciplinary action including termination may be taken without preliminary warnings.

3.



# TERMINATIONS

Termination is an undesirable outcome for both the employee and the Company, but may be necessary if the employee is unable or unwilling to meet the Company's performance standards.

It is our goal to make this a satisfying work environment which encourages and rewards long-term employment. However, it should be understood that, unless there is a written employment contract between the parties, there is no obligation on the part of the Company or any employee to continue this relationship for any guaranteed or specified time.

You are free to resign your position at any time you wish, with or without notice, and for any reason you deem appropriate. While the Company would appreciate advance notice if you plan to resign, this is a matter of courtesy and is not required by law. Likewise, the Company has the right to terminate any employee at any time, with or without notice, for any reason not prohibited by specific contracts or laws.

No one has the authority to make any promises or guarantees of permanent employment on behalf of the Company.

The company recognizes and understands the desire for job security at every level of employment. No business has the power, however, to guarantee a lifetime job to anyone. The Company believes the best way to achieve continued success and job security is through the joint efforts of management and all employees to continually offer superior service to our clients. Job security is not something that any company can promise you. Your future is something you create for yourself through your own skills and dedication.

You can be assured, however, that it is our policy to avoid layoffs or terminations insofar as possible. But we must reserve the right to take such actions as are necessary for the survival and well-being of the organization.

If you should decide to resign voluntarily, the Company would appreciate as much advance notice as possible. A leave of absence may be explored as an alternative to termination, if you so desire.

# SUBSTANCE ABUSE

To protect the safety and well-being of the Company, its employees, clients, and business associates, this Company specifically prohibits any and all of the following:

   * Use, possession, sale or transfer of alcohol or illegal drugs on its premises or while performing work-related duties. Illegal drugs include marijuana and all other drugs not prescribed by a licensed physician for use by the person possessing them.

   * Being under the influence of alcohol or illegal drugs while on company property or performing work-related duties.

   * Use of alcohol or any illegal drug, on or off company property, when it affects the employee's work performance, the employee's or other workers' safety, or the employer's position in the community.



4.



Employees should not report for work or attempt to perform work-related duties while under the influence of alcohol or illegal drugs. If an employee's appearance or behavior indicates a reasonable possibility that he/she is under the influence of alcohol or drugs, management will take whatever steps are necessary to protect the safety of the employee and others who might be affected.

It is not the Company's desire to invade an employee's privacy or to restrict your personal freedoms. However, it is our responsibility and obligation to provide a safe workplace. Certain restrictions and policies are necessary for the safety and security of all Company employees and clients, as well as the efficiency and quality of the work performed. Employees and clients must not be subjected to dangerous conditions created by others who are impaired as a result of ingesting harmful substances.

Any employee who violates the above policies concerning alcohol or illegal drugs will be subject to disciplinary action, up to and including the possibility of termination, with or without further warnings, depending on the employee's performance record and the seriousness of the infraction.

Compliance with the above prohibitions under "Substance Abuse" is understood and accepted by all employees as a specific condition of employment with this Company.

## DRUG AND ALCOHOL TESTING



At present, the Company does not regularly conduct drug or alcohol testing for employees or job applicants. However, we reserve the right to do so if circumstances warrant. We may conduct such testing among applicants, among all employees, a random sample of employees, or certain specific employees, if there is a legitimate reason to do so. We may require immediate testing for alcohol or illegal drugs if an employee is involved in a work-connected accident or injury, or if an employee's behavior suggests that he/she is under the influence of drugs or alcohol.

Cooperation with such testing, if requested by the Company, is a condition of your employment here. Refusal to submit to such testing will be considered a voluntary quit without good work-related cause.

## SAFETY

Your safety in the workplace is of utmost importance to us. We have made a considerable investment in providing safe working conditions, providing proper tools and equipment, and providing proper training to ensure that you and your co-workers can perform your jobs in a safe and efficient manner.

You must do your part to ensure your own safety and that of your co-workers. If appropriate, specific training materials and safety procedures relevant to your position have been provided by your supervisor. It is understood that reading, understanding, and complying with these instructions are a requirement for your continued employment with this Company. Violation of safety regulations or procedures is grounds for discipline, up to and including possible termination.





If you observe any violations of safety procedures or regulations, or any unsafe conditions, it is your obligation to report it to management **immediately** so that the problem can be corrected at once. (The word "immediately" is to be taken literally — i.e., the moment that the situation is observed.)

Anyone who observes or is involved in any accident or injury involving anyone on Company property or on Company business must report the incident to management **immediately** (i.e., as soon as it occurs) so that appropriate action can be taken. Failure to do so may result in disciplinary action and may also jeopardize an employee's right to medical benefits or any other compensation stemming from the incident.

If a workplace accident or injury does occur, the Company has the right to request that all individuals involved submit to immediate testing for the presence of illegal drugs or alcohol. This is for your protection, as well as the Company's. If these substances were not a factor in the incident, you will want these tests as evidence in your behalf.

## HARASSMENT

This Company strictly prohibits the harassment of any other person on any basis. This includes race, sex, national origin, religion, age 40 and over, disability, sexual orientation, marital status, and any other personal characteristics.

Harassment is defined as any behavior (verbal, physical or visual) that is reasonably considered unwelcome or offensive to another employee and/or creates an intimidating, hostile, or offensive work environment for any other employee.

Sexual harassment is also specifically prohibited. Harassment includes subjecting another person to sexually provocative materials or comments, unwelcome or inappropriate physical contact, insistence on an unwelcome personal relationship, lewd or suggestive personal comments, and any other verbal, physical or visual behavior which is considered unwelcome or offensive to another employee and/or which creates an intimidating, hostile, or offensive work environment for any other employee.

We recognize that people have different standards as to what type of behavior or conversation is appropriate and in good taste, or what sort of humor is amusing versus offensive. It is possible that a person may not realize that his or her behavior is considered unwelcome or offensive to others. Therefore, if you are ever treated by another employee in a way that you believe might constitute harassment, it is your responsibility to **immediately inform the other person that such behavior is unwelcome and offensive.**

Once might be considered a misunderstanding. However, repetition of such behavior after being so informed will be considered harassment and will result in management action to correct the situation and prevent any further occurrence.



If you wish, you may inform your supervisor or anyone in management when the first incident occurs, so that it can be documented. The privacy and confidentiality of everyone involved will be protected. If you believe that the one incident was a misunderstanding and not harassment, no further action will be taken unless you request it.

6.



If the offensive behavior is repeated, it is your obligation to report it to someone in management promptly, so that corrective action can be taken to prevent any further occurrence.

One type of harassment that will not be tolerated under any circumstances is for anyone in a supervisory or management position to threaten, state, or imply that an employee's position or future with this Company will be either helped by participation in a sexual or personal relationship or harmed by the refusal to participate.

Continued employment and advancement in this Company is based strictly on merit and job performance and does not require any physical, sexual, or personal relationship outside of the specific performance of one's work duties. Any suggestion to the contrary by any supervisor or manager will be considered a form of harassment and will not be tolerated.

If you are ever harassed by someone in a supervisory position, it is your obligation to report it to management immediately, the first time such an incident occurs. Management must be informed so that we can take immediate action to eliminate this behavior.

Also, we will not tolerate harassment of our employees by any of our clients, vendors or associates. If such a situation occurs, you should report it to someone in management immediately so that we can take corrective action.

Any employee, manager, or supervisor found guilty of harassment will be subject to disciplinary action, up to and including possible termination without further warnings.



## COMPENSATION POLICIES

### JOB CLASSIFICATIONS

Job classifications fall into two types, as defined by Federal law. This classification determines who is or is not eligible for overtime pay. It depends primarily on the nature of your job. Below is a summary of these definitions.

**Exempt:** Executive, administrative, professional, or outside sales positions. People in these positions spend 80% or more of their time supervising others, handling sales, administration or policies, or doing work that requires special training or study. Exempt employees are paid on salary or commission. Exempt employees are not eligible for overtime pay.

**Nonempt:** All hourly workers are nonexempt. Salaried workers whose jobs do not fit the above requirements are nonexempt. Nonexempt employees will be paid overtime for properly authorized work in excess of 40 hours in a given week.

See your manager if you have any questions as to your specific job classification.

7.



## OVERTIME

From time to time, employees may be asked to work beyond the standard work day or work week. Every attempt will be made to avoid the need for overtime, through planning and organization of the work flow. Any necessary overtime will be scheduled with consideration for employees' personal needs as well as the needs of the Company and its clients.

We are required to compensate non-exempt employees for overtime in accordance with Federal and State law. Exempt employees are not eligible for overtime pay. Nonexempt employees are entitled to be paid overtime for all properly authorized work in excess of 40 hours in any given week. Nonexempt employees must receive advance authorization from their supervisor or manager for overtime work requiring additional compensation. Consideration will be given to billable time of the employee so work which could be completed in regular work day is not neglected.

The overtime rate is one-and-one-half times the regular rate of pay, in compliance with Federal law.

While exempt employees are not eligible for overtime pay at a scheduled rate or for compensatory time on a one-to-one ratio, it should be noted that recognition will be given to any extra efforts as a part of the employee's overall performance evaluation. At management's discretion, exempt employees who work significant amounts of overtime may be given a bonus as compensation. These bonuses are at management's discretion.

## EMPLOYEE PERFORMANCE EVALUATION

Supervisors are expected to maintain frequent communication with new employees regarding their duties and their performance, particularly during the first month of employment. All employees should feel free to ask their supervisors any questions they may have regarding their duties or their performance at any time.

New employees will receive a written performance evaluation at the end of six months. All employees will receive a written performance evaluation annually, dating from the date of hire..

## CONFLICT OF INTEREST

The integrity of our relationship with our clients is of the utmost importance to our business: To avoid any actions that might undermine this integrity, the following will be considered a conflict of interest and are prohibited unless you have prior approval from business owner.

*Approaching a client with regard to doing private work for that client on the employee's personal time.

*Any purchase or sale of assets between any employee and any client.

If you cannot COMMUNICATE your planned actions to management, the action you are considering is probably not proper or appropriate.

Failure to comply with this requirement will be considered a serious violation of company policy and may result in immediate termination.

## WAGE AND SALARY REVIEWS

Wages and salaries will be reviewed annually, at the time of each employee's regularly scheduled performance evaluation. New employees will have an additional review at the initial 6-month evaluation. Any increases granted will take effect at the beginning of the next pay period.

**Please note that a salary review will not necessarily mean a salary increase.** At the time of these salary reviews, merit raises will be given if the employee's productivity, performance, level of responsibility, or other contributions to the company have significantly increased during the time period being evaluated — provided that the company's financial position enables us to do so. Cost of living increases are not guaranteed, but will be considered depending on all relevant factors, including the company's financial resources, as well as economic conditions.

## PAYROLL DEDUCTIONS

Certain payroll deductions are required by law, and others may be authorized or requested by the employee.



By law, we are required to withhold certain minimum amounts from your wages for Social Security Tax (FICA), Medicare Tax, Federal Income Tax (FWT), and any state or local income taxes where applicable.

If you request it, we may withhold more than the minimum amounts for income taxes. We are not allowed to withhold less than the required minimum. These requirements and options are explained on your form W-4. There are certain other legal situations which may require additional withholding, but these occur infrequently.

With your authorization, we may withhold additional amounts for certain purposes, such as insurance premiums, retirement or pension plans, charitable contributions, or other purposes by mutual agreement between management and employees.

Any deductions not required by law must be authorized by the employee, in advance, in writing. You may ask your manager or the person in charge of payroll if you have any questions about your paycheck.

## PAY PERIOD

The Company's standard pay period is:

|  |  |  |
|---|---|---|
| Weekly (five working days) | ( ) |
| Bi-weekly (ten working days) | ( ) |
| Twice per month (1st and 15th of the month) | ( x ) |
| Other:_____ | ( ) |



For purposes of computing payroll, our standard work week begins on Monday and ends on Sunday (e.g., Mon. through Sun.; Sun. thru Sat., etc.).

Pay checks are delivered prior to the close of business on

    1st and 15th

An employee who is discharged will be paid in full within 6 calendar days; an employee who resigns will be paid on the next regularly scheduled payday.

Occasionally, the designated payday may fall on a holiday or a weekend. In this case, paychecks will be distributed on the last working day prior to the holiday or weekend. The law would allow us to wait until the next workday to deliver the paychecks, but we will distribute them early to avoid causing you any hardship or inconvenience.

## PAYROLL ADVANCES



Paying for work before it has been performed creates an accounting burden and a financial hardship for the Company. If we grant it for one employee, in fairness, we must offer it to all, and we simply cannot afford to do this. For this reason, we have adopted a uniform policy that we do not issue payroll advances to any employee. A loan may be considered if absolutely necessary with no interest for a short period of time.

## WAGE GARNISHMENT

There are some situations where an employer is required by law to withhold certain amounts from an employee's paycheck and pass them on to a third party. This is called wage garnishment, and it occurs when you have certain types of unpaid debts, and a creditor has obtained a court judgment against you.

In some states (e.g., Texas), private creditors may not order garnishment of wages, but certain government agencies may. The state may require garnishment of wages if a parent is delinquent in child support payments, or the Federal government may order wages garnished for IRS tax levies or if a person is delinquent in payment of a Federal student loan. In other states, other creditors may obtain such judgments.

We do not wish to become involved in such matters, but we are required to comply with the law if ordered to do so. If such a situation arises, please discuss it with someone in management before a court secures a judgment against you. It may be possible to resolve this situation so that wage garnishment is not required. Be assured that your privacy and the confidentiality of the matter will be respected.

## SEVERANCE PAY



In general, employees will not receive severance pay if they leave the Company voluntarily or are terminated due to unsatisfactory job performance or other cause.

10.



The Company may choose to award severance pay or wages in lieu of notice under certain circumstances, such as forced layoffs, downsizing, or elimination of certain positions due to business necessity.

Such awards will be at the discretion of management, depending on individual circumstances, as well as the Company's financial position.

## EMPLOYMENT REFERENCES

Performance or character references regarding former employees (either written or verbal) are not to be given out by anyone other than business owner.

## UNEMPLOYMENT COMPENSATION

Payroll taxes for Unemployment Insurance are paid **entirely by the employer.** Nothing is withheld from the employee's paycheck for this program. The Company's tax rates are based partly on the overall level of unemployment in the state, but mainly on the number and size of claims paid specifically to our former employees.



While the exact formula for calculating an employer's tax rate is rather complicated and varies from state to state, the basic principle is as follows. Claims that are paid to former employees are charged against an employer's account with the state. This raises the company's unemployment taxes to a higher rate. The company continues to pay at this high rate, usually for several years, as a way of reimbursing the state for the charges against the company's account. So, in addition to paying our people who are working, we are forced to also pay people for **not working.** This becomes extremely costly and is sometimes more than a business can afford.

The difference between the minimum and maximum tax rate for employers can be over **$500 per employee per year!** This is a tax burden we wish to avoid.

Unemployment compensation is intended to help support employees who are laid off work through no fault and no choice of their own. Employees who are fired for work-connected misconduct or voluntarily quit without good work-connected cause are not eligible for these benefits.

Every effort will be made to avoid forced layoffs of productive employees and the personal stress that such layoffs cause for the individuals involved. An employee who is laid off through no fault of his or her own has a legitimate claim to Unemployment Compensation.

This Company will, however. appeal any claims by former employees which we believe are without merit.



11.

# OPERATING POLICIES

## PURPOSE

In establishing our operating policies, it is not our desire or intention to interfere with anyone's personal freedom or desire for individual expression. However, in any sort of group situation, there are certain considerations that must be observed, out of respect for others, and for the good of the entire organization.

In general, our requirements simply reflect good judgment, good taste, and consideration for others. We expect you to treat clients and co-workers with courtesy and respect, to put forth your best efforts in performing your job, and to help us all make this a pleasant and rewarding place to work.

## ETHICAL STANDARDS

We are committed to conducting our business in accordance with the law, and with integrity, honesty, and fairness. This applies to our dealings with clients, with suppliers, and with each other. You should not do anything in the course of Company business that violates the law or your own personal ethics, nor should you be asked to do so. If you become aware of a situation which you believe violates appropriate legal or ethical standards, please discuss it with your supervisor or anyone else in management so that we can resolve it. Your privacy and confidentiality will be respected.

## OPEN DOOR POLICY

We are dedicated to preventing and resolving problems through open, positive communication among all employees and management. If you have a question, a concern, a problem, or a complaint, we urge you to discuss it with your supervisor or anyone else in management. It is management's obligation to listen and respond to employee concerns in an open-minded manner and to work together to find an appropriate solution.

## SUGGESTIONS AND CLIENT FEEDBACK

We are dedicated to the process of constant improvement and welcome any input from employees that can help us accomplish this end. We urge you to submit any suggestions on how we can improve our products, our service, our relationships with clients or suppliers, the efficiency of our operation, our Company policies or working conditions. We specifically urge you to seek feedback from our clients as to how we can better satisfy their needs and to pass these suggestions on to management.





## SMOKE-FREE WORKPLACE

Out of consideration for the health and comfort of the majority of our employees and visitors, this is a smoke-free work environment. We do not wish to dictate your personal habits, but we must protect the well-being of the majority. Smoking is allowed only in designated areas, which will be explained to you by your supervisor. Employees should not allow "smoke breaks" to delay or interfere with the timely completion of their work assignments.

## DRESS CODE

While we do not wish to limit your expressions of taste and individuality, we must all be aware that what we wear to work is a reflection of our own professionalism and that of the organization. We ask you to dress appropriately for our type of business and your position in particular.

In addition, certain requirements must be observed. Clothing should not be provocative (e.g., low-cut, revealing, or extremely tight-fitting). Your clothing should not be hazardous to your own safety (e.g., open-toed shoes or loose hanging shirttails if you are working around machinery). Extremely casual dress is generally not considered appropriate for work. If "casual days" are occasionally designated by management, appropriate guidelines will be explained to you.



Obviously, a professional appearance is especially important for those of us who at any time come into contact with clients and/or potential clients. Please use good judgment and good taste, remembering that rightly or wrongly, people do judge us as an organization, based in part on our appearance.

At this time our company allows Friday to be observed as "casual day" - please remember our organization represents high standards and our clients enjoy and depend on our professionalism in conduct as well as dress. Jeans are not acceptable "casual."

## WORK SCHEDULE

The specific work schedule for your position will be explained to you by your supervisor. Every effort will be made to consider your own personal needs, as well as the demands of your position, in setting your specific work schedule.

**Lunch Breaks:** Employees are entitled to a one-hour lunch break. Depending on the requirements of your particular position, you may choose the hour that is most convenient, so long as all work stations are adequately covered and your absence does not create a problem for co-workers or clients.

## ABSENTEEISM AND TARDINESS

Once your particular work schedule has been determined, you are expected to be at work on time and to work the full number of hours scheduled. Everyone must assume this responsibility, in fairness to your co-workers and our clients.



Some positions require that an employee be at his/her work station during a specified time frame. In such cases, being at your work station during this time is an essential function of your job. Other positions simply require the production or completion of certain assignments to meet a deadline, but there can be flexibility as to when and where the work is produced. The requirements of your specific position will be worked out with your supervisor.

Planned absences should be approved by your supervisor as far in advance as possible. If you are unable to give advance notice but find you must be absent from work for any reason, please call your supervisor as soon as possible. Repeated violation of the attendance requirements of your position will be cause for written warnings, possible discipline and/or eventual termination.

## COMMITMENT TO CONFIDENTIALITY

Over a period of time, this Company has developed certain information, products, processes, procedures, client lists, etc., which are an important part of our business. It is essential for all employees to realize that this information is proprietary and is the property of the Company. It is a violation of your responsibility to this Company for any employee to share this information with any other party or to use it for your own purposes. Keeping this information confidential is a specific condition of your employment with this Company.

Unless there is a written contract to the contrary, any work produced during your employment with this Company is considered "work for hire" and the rights to such work belong to the Company. If you should leave the Company and wish to retain samples of your own work, specific permission must be obtained from management.

Violation of this commitment to confidentiality will lead to discipline, including possible termination and/or legal action.

## EMPLOYEE PRIVACY

We do not monitor employee communications or activities outside of the performance of your job. It is our philosophy that your personal life is your business, but activities on the job, on Company premises, or that affect the Company are not only our concern, but our responsibility.

Under the law, an employer has the right to monitor communications and activities in the workplace and to inspect anything stored on Company property, so long as employees are given advance notice. We hereby reserve the right to conduct whatever monitoring or inspections management deems necessary for adequate supervision of the conduct of business or quality control. Please remember that monitoring or requesting a search is not an accusation of wrongdoing. However, your cooperation if requested may be a condition of continued employment.



It should be understood that Company work time, Company equipment, and Company property are for the purpose of conducting Company business. Any files (electronic or otherwise) on Company property are expected to relate to Company business, not to personal matters. Any matters or items that you wish to remain private should be conducted outside of business hours and stored outside of Company property.

14.



## ELECTRONIC COMMUNICATIONS

Any computer hardware, software, e-mail, voice mail, Internet, or other electronic equipment or service made available to employees is expected to be used solely for the conduct of company business during work hours. Any use of such equipment for personal purposes of any kind must be approved in advance by your supervisor, done on your own time, and conducted in a responsible manner. It must not result in any additional expense to the company, any possible embarrassment or harm to the company, or any loss in productivity with regard to your work.

Specifically, if the Company subscribes to any electronic services on an unlimited usage basis, we do not object if you use these services for personal business before or after work hours or during your lunch break so long as you have the approval of your supervisor and do so in a responsible manner. However, if the Company is charged in any way for time used, you may not use these services for anything other than company business. Under no circumstances should you use these facilities for any personal purpose during the hours you are expected to be working. You may not use the company e-mail or Internet address for personal messages which might mistakenly be interpreted as statements from the company.

Use of all electronic systems will be held to the same standard as other business communications, including compliance with our antidiscrimination and antiharassment policies. Remember that what one person finds humorous might be offensive to others. Also, do not send any materials of a sensitive or confidential nature, which might be intercepted by third parties. Do not put anything in an electronic message that you would not want published or made part of a permanent record. You should notify management of any inappropriate materials that you receive or observe.

You should understand that management may intercept, monitor, copy, review, or download any communications or files that are sent, received, or stored on our systems. Compliance with these policies is a condition of your employment. Failure to comply is grounds for discipline, up to and including possible termination.

Check with your supervisor for details of your specific situation.

## SECURITY SYSTEM AND PROCEDURES

While this policy may seem to be stating the obvious, it is important for every employee to realize that it is part of your responsibility to follow whatever security procedures have been established to protect the Company's property and the safety of its employees. These procedures may be incidental to your job or an important part of your duties. In any case, the Company's security procedures are to be taken seriously, followed, and maintained by all employees. Failure to follow these procedures responsibly can lead to disciplinary action, up to and including possible termination, depending upon the seriousness of the situation.

## TELEPHONE USAGE



Undoubtedly you realize that it is essential for any business to keep its phone lines open for the purpose of conducting business. In addition to the fact that telephone visiting takes employees

15.



away from their work, we can lose significant business if clients, prospects, vendors, etc. can't get through to us because the phones are tied up. The telephone is an important sales tool, and we need sales to preserve our jobs.

**You may make personal local calls when necessary, but please keep these calls brief and to a minimum.** Please remind friends and family members to limit their calls to you. Personal long distance calls on company phones are not permitted.

## POLITICAL ACTIVITY

We encourage your active participation in the political process. However, it is essential that political activity must not interfere with the conduct of our business.

Political differences of opinion can cause conflict and hard feelings with co-workers or customers. In order to avoid such potential problems, no displays of a political nature will be allowed on company premises. Likewise, we expect you to refrain from political discussions with co-workers or clients in the workplace.

At no time should you present your own political views, whatever they may be, as representative of this Company.



## SOLICITATION FOR OUTSIDE CAUSES

While we respect employee participation in causes that you believe in, we cannot allow these outside activities to take you away from your work, to interrupt another employee's work, or to make other employees feel pressured to support or participate.

For this reason, we cannot allow any soliciting for contributions, sales on behalf of any organization, or distribution of any literature during work hours or on Company property. A cause that you passionately believe in may make a co-worker actively uncomfortable, and we want to avoid this type of awkward situation. Any exceptions to this policy must have specific management approval in advance.

If you do choose to solicit your fellow employees outside of work hours, this is up to you. But we do ask that you use restraint and good judgment and not allow your outside activities to cause any strain between you and your co-workers.

If you observe a situation that you believe may cause problems, you are urged to discuss it with your supervisor or anyone in management so that it can be resolved.

Children's school or church projects will be allowed during lunch and before and after work.

## OUTSIDE EMPLOYMENT



We do not believe it is appropriate for us to dictate what you do outside of working hours. Our concern is specifically how well you perform your job for us, and you will be evaluated on that

16.



basis. It is up to you to determine how much work you can handle. Our only restrictions are the following:

* You may not conduct business for any other organization on this Company's time.

* You may not take on any outside employment that would constitute a conflict of interest. Working for our competitors does constitute a conflict of interest and is prohibited during your employment with us.

## POSTED NOTICES AND INFORMATION

Your manager will show you the location of the Company bulletin board or central posting area. We are required by law to post certain notices, such as our compliance with the fair employment laws, and information on your rights as an employee. In addition, there may be notices posted by management for your benefit. Employees are not to place materials in the posting area without prior permission from management.

## PERSONNEL FILES



Certain personnel records are required by law, and others are needed for company benefits and administrative purposes. Please be sure that all personal information in your file is accurate and up-to-date.

We respect your right to have the information in your records treated confidentially. Other than records which we are legally required to make available to government agencies or other parties, we will not release any information from your files or regarding your employment here without specific authorization from you.

If you wish, we will give you the opportunity to review your own personnel files upon request and to have any statements or comments of your own added to the official file.

## POSSESSION OF FIREARMS AND WEAPONS

Possessing firearms or weapons, concealed or otherwise, on or in Company property may threaten the safety of others. Therefore, you may not bring such weapons onto Company property or possess them while conducting Company business. Failure to comply with this policy will result in discipline and potential criminal charges.

## IMPROPER PERSONAL CONDUCT



Following is a list of miscellaneous unacceptable behavior which can lead to disciplinary action, ranging from a warning to suspension or possible termination.

17.

Certainly, common sense and good judgment should prevent any of these occurrences, but they are listed here to prevent any possible question or misunderstanding.

The following actions will not be tolerated and may be cause for discipline or termination without further warning:

- *Possessing or bringing weapons or explosive materials on company property.
- *Fighting on company property.
- *Using abusive, foul, or threatening language.
- *Stealing or willfully damaging company property or another employee's equipment or personal property.
- *Performing any type of immoral or indecent acts on company property.
- *False or misleading pre-employment application or information.
- *Falsifying verbal or written information.
- *Refusal to comply with a directive from a supervisor.
- *Any other action that threatens the well-being or safety of a co-worker, client, or vendor.

It should further be understood that violation of company policies in the following areas will be considered serious enough to warrant discipline, up to and including possible termination without further warning:

- *Intentional illegal discrimination.
- *Sexual or any other form of harassment.
- *Illegal drug or alcohol use or posession during work hours, on Company property, or while conducting Company business.
- *Refusal to submit to illegal drug or alcohol testing if required by the Company.
- *Violation of safety requirements or regulations.
- *Disclosure of confidential Company information.
- *Violation of electronic communications policies.

The above lists should be considered illustrative, not comprehensive. Other actions and violations of a similar nature may also result in discipline and/or termination.

## COMPANY BENEFITS

## PAID TIME OFF

You should be aware that employment law does not require any employer to offer its employees paid time off. To the extent that they can afford to, companies do this as an employee benefit, in order to attract and keep good people. However, many companies, especially smaller companies and certain types of businesses, cannot afford to offer this benefit.

Because of the economics of their business, many companies cannot afford to offer paid time off to hourly employees. If employees cannot work their assigned shift, the company must pay

18.



someone else to replace them. Often, companies cannot afford to pay one employee for not working and also pay that employee's replacement.

For salaried employees, most companies can only offer paid time off when the employee's work load can still be accomplished in some other way — either by postponing the work until the employee returns, or by having other employees take over these duties temporarily. If this is possible, then most companies do offer paid time off.

Most companies provide paid time off only to those who work full time on a regular, ongoing basis. They do not give paid time off to part-time employees or those who have been hired only on a short-term or temporary basis.

Due to the nature and the economics of our particular business, we have adopted the following policy regarding paid time off:

*We cannot afford to offer paid time off to any of our employees.*     ( )

*We can only offer paid time off to salaried employees.*     ( )

*We offer paid time off to both salaried and hourly employees.*     ( x )

Only full-time employees will be considered eligible for paid time off. Full-time is defined as working a minimum of 1000 hours per year.

Any arrangements different from the stated company policy must be agreed to in writing, in advance.

## HOLIDAYS

Following are the national holidays which are observed by most businesses, and which will be paid holidays for our Company:

          New Year's Day
          Memorial Day
          Independence Day (July 4th)
          Labor Day
          Thanksgiving Day and Friday after
          Christmas Day

Additional paid holidays may be given from time to time at management's discretion, depending upon our work load, client needs, and economic circumstances.

If one of these holidays falls on a weekend, managment will look at these on a case by case basis to determine if another work day will be subsituted.



To avoid excessive costs to the Company, we will not pay salaried employees additional wages if it is necessary to work on a holiday. For salaried employees, you can take a compensatory day off at another time (whenever your work load allows) if you are required to work on a holiday.

Any hourly employees who are entitled to a paid holiday may choose between being paid time and a half if you are required to work a holiday or taking a compensatory day off when your work load allows. As with any other work requiring overtime pay, working on a holiday must be authorized in advance by your supervisor.

You must work the day before and the day after a holiday or the holiday will be charged to your vacation time.

## VACATIONS

For employees who are eligible for paid vacation, your vacation pay will be at the same rate as your regularly scheduled work week. The vacation accrual rate is based on what the Company can afford to pay and is also designed as an incentive and reward for length of service with the Company. The accrual rate is as follows:

| | |
|---|---|
| 1 - 8 full year | 10 days (2 week) |
| 9 - full year | 15 days (3 weeks) |

An employee has not earned any paid vacation days until he/she completes one full year of service with the Company. At that time, you are entitled to 10 paid vacation days (the equivalent of two work-weeks). You start accruing three weeks at the beginning of your 9th year.

**Vacation Schedules:** Vacations may be taken in whatever blocks of time you prefer, so long as your work load is adequately covered. Your vacation schedule must be approved in advance by your supervisor. Every effort will be made to give you the vacation schedule you want, but approval will be determined by the work load and any other vacations or days off that have already been scheduled. As you can see, it is to your advantage to get your vacation scheduled and approved as far in advance as possible. We must be aware of our busy season and demands of the job. All efforts need to be made to avoid sensitive tax dates, especially Jan - April 15th.

**Maximum Accrual:** The maximum number of vacation days that can be accrued is 15 days (3 work-weeks). If you have accrued the maximum, you must use some of your vacation days within the next month, or you will not be credited for any more accrued days over the maximum.

**Unused Vacation Time:** Any employee who is terminated by the Company or resigns voluntarily will be paid at his/her regular rate for any unused accrued vacation time -- unless the employee is discharged for gross misconduct in connection with his/her position with the Company (e.g., theft, embezzlement, or other serious actions harmful to the Company).

If you resign voluntarily, we request that you give the Company at least two weeks advance notice of your resignation.

**Additional Note:** Please remember that employment law does not require any employer to provide paid vacation time. We do this by choice, to reward employees for their contributions and to give you time away from work to rest and renew your energy and enthusiasm.



20.



## PAID PERSONAL DAYS

The Company does not provide sick leave to any employees; however, since we do not want to encourage you to come to work sick, the Company will offer three paid personal days per year. Eligible full-time employees accrue paid personal days at the rate of 1/4 day per month worked. The Company will start you with a bank of one day beginning January 1, 2000.

This policy takes the place of the more conventional "sick leave" where you get time off only if you are sick -- or claim to be sick. We believe our policy will give employees more flexibility in their personal lives and will allow for better planning between employees and supervisors.

In addition to any vacation and holidays, every eligible employee is entitled to the three additional paid personal days per year of work, to use in any way you see fit. These personal days can be used for any combination of illness, doctors' appointments, family, business, child care, or any other personal needs.

Whenever you are away from work for any personal reason, the time missed will be charged to your accrued personal time bank.

You may not accrue more than three unused personal days at any time. This is a "use it or lose it" policy. Financial compensation will **not** be paid in lieu of unused personal days.

We urge you to use maturity and judgement in taking these days for reasons other than illness. Try to take them at times when your work load allows it, so your absence will not be a burden on your co-workers or cause problems for our clients. Please schedule these days off in advance with your supervisor whenever possible.

Pay for exempt employees cannot be docked for time off of less than a week. However, responsible use of your time will be a factor in every employee's performance evaluation.


## BEREAVEMENT

In addition to any previously accrued vacation or personal days, you will be granted a two-day leave of absence, with pay, in the event of a death in your immediate family. If more time is needed, you may use accrued personal days or vacation days.


## JURY DUTY

In the event that you are selected for jury duty, the Company will allow you to serve and will make every effort to see that this service does not impose a financial hardship on you.

For all employees, the Company will continue to pay your regular salary for a period of up to 30 days while you are serving jury duty, and you may keep the fee you receive for jury service. Longer periods of jury service are extremely rare, but will be handled on an individual basis should they occur.

21.



While this does involve a cost to the Company, we do this as our contribution to the community so that juries will have access to those people who are regularly employed. Please notify your supervisor as soon as you receive your jury summons so that we can accommodate your work schedule.

## WITNESS DUTY

If you are called to be a witness in a court procedure, you may take time off, with pay, for the length of time actually required in court. This usually is a period of a few hours, but is not to exceed one full work day. If the time involved exceeds one day, you may use accrued personal days or vacation days.

## VOTING

If you have the opportunity to vote in advance under an "early voter" program, we encourage you to use this option, in order to avoid standing in long lines or taking time off from work.

If you do not take advantage of this option and need to vote on election day, we will allow you to arrange your work schedule to have a 2-hour period to vote during the time the polls are open. Please arrange this in advance with your supervisor.

## LEAVES OF ABSENCE

Under certain circumstances, the Company will allow employees to take a leave of absence without pay. Whenever it is required by law, the Company will continue to pay for company-provided health care benefits during your leave of absence. If this is not required by law, a joint decision will be made by management and the employee regarding the handling of any benefits.

For the employee-paid portion of benefit coverage during a leave, funds to cover your share of each month's premiums must be received by the Company on or before the 10th day of each month. If any monthly payment is more than 30 days late, the employee's benefit coverage may be dropped for the duration of the leave. If a check is returned for insufficient funds, the payment will **not** be considered to have been made until sufficient cash, money order, or cashier's check is received by the Company.

Please bear in mind that even if you pay for these benefits out of pocket while you are absent from work, the group rates through the company's plan may still save you a great deal of money, compared to what you would have to pay for comparable coverage if you had to buy it as an individual.

Unless required by law, the granting of a leave of absence is at management's discretion, and all relevant circumstances will be taken into account in making this decision. Written request for leave should be submitted to your supervisor at least 30 days in advance, whenever feasible. Sufficient advance notice will enhance our ability to grant your request.



Unless otherwise agreed upon in writing, during your absence, you must contact your supervisor every two weeks regarding your status and confirming your planned return to work. Unless otherwise designated by law, if you do not contact your supervisor as required or do not return to work at the agreed upon time, without securing written approval for an extension, this will be considered a voluntary quit, without good work-related cause.

When taking a leave of absence, any accrued paid personal days and paid vacation will be applied first, before the unpaid period begins. Unless otherwise required by law, further paid holidays, personal days, paid vacation, or seniority will not accrue during any unpaid leave of absence.

## PERSONAL OR MEDICAL LEAVES NOT REQUIRED BY LAW

Even if not required by law, the Company will make every effort to grant leaves of absence for personal or medical reasons whenever possible, giving full consideration to the needs of the employee as well as the Company. Unless mandated by law, the length of leave granted and the conditions upon return will be based on individual circumstances.

Whenever possible, we will consider other alternatives to meet your needs, such as a shortened work week, part time work, job sharing, or flexible work schedules. The feasibility of such arrangements will depend on many factors: the specific requirements of your position, the ability to meet customer needs, the cost to the company of additional training or administration, and possible effects on co-workers or clients.

Because the requirements of each job are unique, we will not be able to offer exactly the same arrangements to all employees. We will, however, do the best we can to accommodate everyone, considering all of the circumstances. For this kind of flexible approach to succeed, all employees must take a mature, responsible, and cooperative attitude. If we find that a flexible approach causes problems rather than solving them, we will have to be more strict and less flexible.

If you have a good performance record, we will not want to lose you as a valued employee. We will make every effort to help you meet your family and personal needs without sacrificing your professional goals.

## MILITARY LEAVE

Federal law governs certain requirements regarding granting of leave, compensation, and reinstatement for veterans and reservists who are away from their jobs performing service in uniform. These laws change from time to time. If this situation occurs, managment will confer with legal counsel regarding the regulations applicable to your specific situation.

# INSURANCE

## ON-THE-JOB ACCIDENTS OR INJURIES

You may be entitled to medical payments and/or other compensation if you are injured on the job. Management will explain to you any such programs that have been provided for you. Notices are posted regarding Workers Compensation coverage or non-coverage for employees.

If an injury occurs during the regular workday, the injured employee will be paid for that full workday. Any injury or accident that occurs on Company property or while on Company business must be reported to management **immediately** (i.e., as soon as the incident occurs). If such an incident occurs outside of regular business hours, it is still the responsibility of the injured employee to contact an appropriate person in management **immediately**, to describe the circumstances and be instructed as to how to proceed.

You will be given instructions as to how to contact management outside of regular business hours if necessary.

**Do not delay** reporting an incident in order to wait and see if there are any serious or long-term physical symptoms that arise. Report it to management immediately, and follow any instructions you are given at that time.

This prompt reporting is essential, in order for us to properly document any such incidents and take appropriate action. Failure to report an accident or injury immediately, or failure to follow management's instructions following the incident, may be cause for discipline and may make the employee ineligible for any medical payments or other compensation related to the incident.

Any benefits or compensation applicable to on-the-job-injuries will not apply to any voluntary activities that are not considered a part of the employee's required work duties.

## MEDICAL INSURANCE

The Company provides a medical insurance plan for all full-time employees. Unless otherwise agreed upon in writing between the Company and the employee, eligible employees are those who work 1000 hours per year or more.

Your supervisor will provide you with information as to the coverage offered, premiums, method of payment, and any waiting periods or other requirements.

We are sure you are all aware of the rising costs of medical care and medical insurance premiums. We have tried to provide basic coverage that is fair for all employees and to offer additional coverage for those who need it and wish to purchase it. Although we realize that insurance premiums are burdensome, we encourage those of you who have dependents or special needs to purchase additional coverage to protect yourself from disastrous medical expenses.

In purchasing any additional health insurance, whether it be through the Company plan or other sources, we recommend that you study carefully the exact details of what is covered and not covered in any plan you are considering. Make sure the coverage is comparable when comparing premiums. You should also consider the reliability and financial soundness of the insurance carrier, in addition to the cost of the premiums.





## EMPLOYEE ACKNOWLEDGEMENT FORM

By signing this form, I acknowledge that I have received a copy of this Company's current Employee Policy Handbook. I understand that it is my obligation to read it, understand it, and abide by the policies described. I understand and agree that compliance with all Company policies is a condition of my employment with the Company.

I further understand and agree that certain policies are of particular importance to the Company and that violation of these policies will be grounds for discipline, up to and including possible termination. These policies of particular importance are: Equal Employment Opportunity, Sexual Harassment, Safety, Substance Abuse, Drug and Alcohol Testing, Commitment to Confidentiality, and Improper Personal Conduct.

I also understand that my employment with the Company is not to be considered permanent or for any guaranteed length of time. Our employment relationship will continue as long as it is mutually satisfactory to both parties. I may resign at any time, with or without notice. And the Company may terminate my employment at any time, for any reason it deems necessary, so long as this action does not violate any laws.

No one representing the Company has the authority to enter into any agreement different from that stated above, unless there is a written contract signed by both parties (Company and employee).

_____          _____
Employee Name (Please Print)               Date


_____
Employee Signature


_____          _____
Supervisor Name (Please Print)             Date


_____
Supervisor Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

STEPHANIE GOETZ AND           )
KEVIN MCGILL,                 )
INDIVIDUALLY AND ON           )
BEHALF OF ALL OTHERS          )
SIMILARLY SITUATED            )
                              )
VS.                           )   CIVIL ACTION NO.
                              )   A-02-CA-081-JN
SYNTHESYS TECHNOLOGIES,       )
INC.; MICHAEL J.              )
FLEISCHHAUER; HARRY           )
GITTES; WALTER                )
LOEWENBAUM; JAMES             )
KEVER; AND MARVIN             )
GRESHAM

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**STEPHANIE DENISE GOETZ**

NOVEMBER 4, 2002

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONDENSED TRANSCRIPT AND KEYWORD INDEX

COPY   **AcuScribe**
       Court Reporters

240 Norwood Tower          Telephone:  (512) 499-0277
114 West 7th Street        Toll-Free:  (800) 497-0277
Austin, Texas 78701        Fax:        (512) 499-0298
www.acuscribe.com          acuscribe@acuscribe.com

EXHIBIT
D

BSA                    ORAL DEPOSITION OF STEPHANIE DENISE GOETZ                    XMAX(9/9)

Page 49

(1)   A.   Yes, sir.
(2)   Q.   And does that comport with your recollection
(3)   of about when this document was filed?
(4)   A.   Yes, sir.
(5)   Q.   Okay. In the middle of the first page of the
(6)   document, it reads, "Defendants have not paid
(7)   plaintiffs for work they have performed, and
(8)   defendants have requested that plaintiffs work without
(9)   pay." Correct?
(10)   A.   Correct.
(11)   Q.   Okay. Now, did someone request that you work
(12)   without pay?
(13)   A.   Yes, sir.
(14)   Q.   Who made that request?
(15)   A.   Mr. Fleischhauer.
(16)   Q.   When did he make that request?
(17)   A.   On January 23rd.
(18)   Q.   And what did he say?
(19)   A.   Actually, he made that request, I feel, prior
(20)   to that. When he did not pay me on the 15th, I was
(21)   requested to work without pay from the 1st through the
(22)   15th. And on January 23rd, when I demanded my
(23)   paycheck because I was being requested to continue to
(24)   perform my duties, Mr. Fleischhauer presented me with
(25)   my paycheck and commented that I should not have a

Page 50

(1)   problem continuing to work because I was considered a
(2)   paid employee. I clarified with him, no, sir, I am
(3)   paid through the 15th only. And we discussed the fact
(4)   of the 16th through the end of the month, and he said
(5)   he did not know whether he would be able to pay for
(6)   those additional days. And I clarified, so you're
(7)   requesting that I work without pay on the good faith
(8)   that you may or may not pay me? And he says, that's
(9)   correct. And he also put stipulations on me working.
(10)   Q.   Okay. And did he – you say he put
(11)   stipulations on you working. What exactly did he say?
(12)   A.   In order for me to receive my two –
(13)   Q.   Just a second. Excuse me for interrupting.
(14)   I just want to – before we go down this line, I would
(15)   like for you to, as nearly as you can – in your last
(16)   statement about your conversations, a lot of it was
(17)   broken off into "we discussed" and things like that.
(18)   I would like to have this, as nearly as we can, just
(19)   so it will be clear for the record, you saying what
(20)   you said and then say what he said and like that. It
(21)   will be a lot clearer on the record –
(22)   A.   Okay.
(23)   Q.   – than just a general snapshot. And I'm
(24)   sorry I interrupted you, and I'll try not to do it
(25)   again.

Page 51

(1)   A.   When I asked him about receiving my two
(2)   weeks' severance in an e-mail conversation, he replied
(3)   to me via an e-mail that in order for me to receive my
(4)   two weeks' severance, I would need to continue to
(5)   provide support during the transition period.
(6)   Q.   Now, that's an e-mail from – he said that in
(7)   an e-mail to you?
(8)   A.   Yes.
(9)   Q.   Is that correct?
(10)   A.   That's correct.
(11)   Q.   Do you have that e-mail?
(12)   A.   Yes.
(13)   Q.   Okay. I had asked you about how
(14)   Mr. Fleischhauer requested that you work without pay.
(15)   Do you remember that?
(16)   A.   Yes.
(17)   Q.   Okay. And you said that at the meeting on
(18)   January the 15th, he asked that you work without pay.
(19)   What specifically did he say that led you to believe
(20)   that he was asking you to work without pay on January
(21)   the 15th?
(22)   A.   He continued to request items of me that were
(23)   my job responsibilities even though I was not being
(24)   paid.
(25)   Q.   Okay. I was talking about a specific point

Page 52

(1)   in time, January the 15th at a meeting. Did he make
(2)   those requests of you at that meeting?
(3)   A.   At that meeting? No, sir. In front of the
(4)   employees?
(5)   Q.   That's correct.
(6)   A.   Not in front of the employees, no, sir.
(7)   Q.   At that particular meeting?
(8)   A.   No, sir.
(9)   Q.   After that, he asked that you perform job
(10)   tasks, correct?
(11)   A.   Correct.
(12)   Q.   And did he specifically say, Stephanie, do
(13)   this, but I want you to do it without pay?
(14)   A.   He requested me to continue performing my job
(15)   duties. I reminded him that he had not paid me. And
(16)   he says, I am aware of that.
(17)   Q.   All right. Did he say anything like,
(18)   Stephanie, I'd like for you to keep working without
(19)   pay?
(20)   A.   He said, I would like for you to keep working
(21)   in good faith, that I will pay you as soon as we're
(22)   financially able.
(23)   Q.   Okay. When did he say that?
(24)   A.   On or about January 23rd.
(25)   Q.   Was there anybody else there when he said

Page 53

(1)   that?
(2)   A.   No, sir.
(3)   Q.   And by that point in time you had already
(4)   contacted attorneys, correct?
(5)   A.   Correct.
(6)   Q.   Did you tell Mr. Fleischhauer that you had
(7)   contacted attorneys?
(8)   A.   No, sir.
(9)   Q.   Could I direct your attention to Page 5 of
(10)   Exhibit 1, please? Could you look down at No. 26 where
(11)   it provides that, "Defendants' failure to pay
(12)   plaintiffs was a breach of contract"? Do you see
(13)   that?
(14)   A.   Yes, sir.
(15)   Q.   What contract was that?
(16)   MR. BRAZIEL:   Objection; form.
(17)   Q.   (By Mr. Lewis) You can still answer the
(18)   question.
(19)   A.   They failed to pay me on my payday – on my
(20)   designated payday.
(21)   Q.   Okay. So basically the only contract that
(22)   you're alleging that was breached was their failure to
(23)   pay you?
(24)   A.   That is correct.
(25)   Q.   Okay. When did you first learn of the

Page 54

(1)   existence of a company named Personal Administrators?
(2)   A.   Either late in 2000 or the beginning of 2001.
(3)   Q.   How did you learn of the existence of a
(4)   company called Personal Administrators?
(5)   A.   I received a phone call from a person that
(6)   worked there by the name of Cindy requesting
(7)   information on a loan – or loans that Mr. Loewenbaum
(8)   had made to Synthesys Technologies.
(9)   Q.   Okay. Do you know – would that be Cindy
(10)   Rust? Do you know her last name?
(11)   A.   That would be correct.
(12)   Q.   And you believe that was sometime in 2000 or
(13)   2001?
(14)   A.   That's my best recollection.
(15)   Q.   Okay. And did you ask Ms. Rust who it was
(16)   that they had the authority to seek that
(17)   documentation?
(18)   A.   Yes, I did.
(19)   Q.   And what did she say?
(20)   A.   She said that she maintained the personal –
(21)   some personal finances for Mr. Loewenbaum and that he
(22)   had requested that she contact Synthesys Technology in
(23)   regard to these two particular loans.
(24)   Q.   Okay. Did you request anything in writing
(25)   authorizing you to disclose that information?

Page 55

(1)    A.    At that particular time, I did not release
(2) any information to her. I said I would have to call
(3) her back. And I went to Mr. Fleischhauer and
(4) discussed the matter with him.
(5)    Q.    And what did Mr. Fleischhauer tell you?
(6)    A.    Mr. Fleischhauer said it would be okay to
(7) release that particular information to her, to Cindy.
(8)    Q.    Did you develop an understanding of what
(9) business Personal Administrators was in at that point
(10) in time?
(11)    A.    Not really.
(12)    Q.    Okay. Did they tell – what did Cindy – or
(13) did Cindy tell you why she needed that information?
(14)    A.    Not really.
(15)    Q.    But you understood at that point in time that
(16) Personal Administrators had, in some manner, dealings
(17) with Mr. Loewenbaum's financial efforts?
(18)    A.    That is correct.
(19)    Q.    When did you next speak to anybody with
(20) Personal Administrators?
(21)    A.    Cindy called me periodically to receive a
(22) status on the loans that Mr. Loewenbaum had with
(23) Synthesys to see if they had been paid back by
(24) Synthesys Technologies.
(25)    Q.    Had they been?

Page 56

(1)    A.    No, sir.
(2)    Q.    Do you know how much money these loans were
(3) for?
(4)    A.    I don't recall the exact figures. I believe
(5) they were for at least around $90,000.
(6)    Q.    Had other members of the board of directors
(7) loaned money to Synthesys?
(8)    A.    Yes, sir.
(9)    Q.    Do you recall the amounts of any of those
(10) loans?
(11)    A.    No, sir.
(12)    Q.    Were they substantial?
(13)    A.    Yes, sir.
(14)    Q.    Do you know if Mr. Loewenbaum's – if the
(15) loan that Mr. Loewenbaum had made to Synthesys was
(16) ever repaid?
(17)    A.    Not to my knowledge.
(18)    Q.    Do you know if the loans that the other
(19) members of the board of directors had made to
(20) Synthesys were ever repaid?
(21)    A.    Not to my knowledge.
(22)    Q.    So when Ms. Rust would call you about the
(23) status of Mr. Loewenbaum's loans, would it simply be
(24) that you would tell him, no, they haven't been paid,
(25) and that would be the substance of the conversation?

Page 57

(1)    A.    I would inform her, no, they had not been
(2) paid. On the initial first conversation that we did
(3) have, she wanted to know if there were any type of
(4) loan documentation.
(5)    Q.    Okay.
(6)    A.    And I referred her to the law firm that took
(7) care of those particular matters.
(8)    Q.    And what law firm is that?
(9)    A.    Jenkens & Gilchrist.
(10)    Q.    Jenkens & Gilchrist did handle affairs for
(11) Synthesys Technologies?
(12)    A.    Yes, sir.
(13)    Q.    Was there a specific individual there that
(14) you referred her to?
(15)    A.    Susan Casey.
(16)    Q.    Was there some point in time that you began
(17) to have discussions with Synthesys Technologies – I
(18) mean, not Synthesys. Strike that question.
(19) Was there some point in time when you
(20) began to have discussions with Personal Administrators
(21) about the possibility of going to work at Personal
(22) Administrators?
(23)    A.    Cindy called me on or about the week of
(24) July 22nd – I'm sorry – January 22nd, 23rd, and said
(25) she was aware that Synthesys was most likely going out

Page 58

(1) of business. She wanted to get one final update
(2) regarding the loans. She also said that they would
(3) probably be hiring someone in the near future, and
(4) asked if I would send her my resume.
(5)    Q.    So it's your testimony that Cindy told you
(6) that she understood that Synthesys would likely be
(7) going out of business?
(8)    A.    Yes.
(9)    Q.    And you did not tell her –
(10)    A.    No.
(11)    Q.    – that Synthesys was going out of business?
(12)    A.    No.
(13)    Q.    You need to wait until I finish my question.
(14) Okay? It will be a mess in the transcript. And she
(15) asked you to send her your resume?
(16)    A.    Correct.
(17)    Q.    Did you send her your resume?
(18)    A.    Yes, sir.
(19)    Q.    When did you send her your resume?
(20)    A.    Sometime around January 23rd.
(21)    Q.    And at the time that you sent your resume to
(22) Personal Administrators around January the 23rd, you
(23) had already spoken to the lawyers about suing
(24) Synthesys, correct?
(25)    A.    Yes, sir.

Page 59

(1)    Q.    You still have Exhibit 1 in front of you.
(2) How long before this document was filed did you first
(3) review this document?
(4)    A.    I don't recall exactly.
(5)    Q.    Was it the day before?
(6)    A.    Approximately a week.
(7)    Q.    It was approximately a week before this was
(8) filed that you reviewed it?
(9)    A.    Yes, sir.
(10)    Q.    That you actually saw this document, or a
(11) document like this?
(12)    A.    Yes, sir.
(13)    Q.    Okay. Was that the first point in time that
(14) you realized that in addition to suing Synthesys
(15) Technologies, you would also be suing
(16) Mr. Fleischhauer, Mr. Gittes, Mr. Loewenbaum,
(17) Mr. Kever, and Mr. Gresham personally?
(18)    A.    This document or –
(19)    Q.    Yes, this document, Exhibit 1.
(20)    A.    Yes, sir.
(21)    Q.    So did it concern you that in addition to
(22) suing the company that you worked for, you were suing
(23) all these individuals personally?
(24)    A.    No, sir. I was fully aware that I was suing
(25) them personally.

Page 60

(1)    Q.    And you knew that Mr. Fleischhauer had done
(2) everything he could to make payroll, correct?
(3)          MR. BRAZIEL:    Objection; form.
(4)          THE WITNESS.    Yes, sir, I was fully
(5) aware.
(6)    Q.    (By Mr. Lewis) And you knew that all of the
(7) directors of the company had loaned large sums of
(8) money to Synthesys that they were never repaid,
(9) correct?
(10)          MR. BRAZIEL:    Objection;
(11) mischaracterizes testimony, vague.
(12)          THE WITNESS:    Correct.
(13)    Q.    (By Mr. Lewis) And yet you sued them
(14) personally?
(15)    A.    That is correct.
(16)    Q.    Does that seem to you like the right thing to
(17) do?
(18)    A.    Yes, sir, it did.
(19)    Q.    Okay. After you sent your resume to Personal
(20) Administrators, when did you next speak to them,
(21) anybody at Personal Administrators?
(22)    A.    Cindy called me at my home on the night of
(23) February 1st and said she had not received the resume
(24) I e-mailed her and asked that I e-mail her another
(25) copy, because they did have an opening to fill.

Page 61

(1)   Q.   Okay. And did you e-mail her that other
(2)  copy?
(3)   A.   Yes, sir, that evening.
(4)   Q.   And that was what day again? I'm sorry.
(5)   A.   February 1st.
(6)   Q.   What was your last day actually working at
(7)  the office of Synthesys?
(8)   A.   January 31st.
(9)   Q.   Now, had you and Mr. Fleischhauer – let me
(10) strike that.
(11) Had you told Mr. Fleischhauer that that
(12) was going to be your last day?
(13)  A.   Yes, sir.
(14)  Q.   Okay. When you left the employment of
(15) Synthesys, did you take any documents with you?
(16)  A.   Yes, sir.
(17)  Q.   What documents did you take with you?
(18)  A.   I took a copy of the payroll which
(19) Mr. Fleischhauer had me generate for the pay period of
(20) the 16th through the 31st. Also, the severance
(21) payroll which he had me generate.
(22)  Q.   Okay.
(23)  A.   I also took e-mail communications that
(24) transpired between Mr. Fleischhauer and myself.
(25)  Q.   Okay.

Page 62

(1)   A.   Employee phone lists with names, addresses,
(2)  and phone numbers; vacation accrual lists.
(3)   Q.   Okay.
(4)   A.   And a copy of the 401(K) contributions for
(5)  the calendar year of 2001.
(6)   Q.   Have you given copies of all of the Synthesys
(7)  documents you took with you when you left on
(8)  January 31st to your lawyers?
(9)   A.   The only document he does not have is the
(10) copy of the 401(K) contributions for 2001, because it
(11) was on a floppy disk and I did not have a way to copy
(12) it until recently.
(13)  Q.   Have you copied it now?
(14)  A.   Yes, sir.
(15)  MR. LEWIS:   I would request that
(16) document as well, please.
(17)  MR. BRAZIEL:   I'll give it to you when I
(18) get it.
(19)  MR. LEWIS:   Okay.
(20)  MR. BRAZIEL:   Do you want it on disk or
(21) do you want it printed out?
(22)  MR. LEWIS:   Both.
(23)  MR. BRAZIEL:   Okay.
(24)  Q.   (By Mr. Lewis) Now, no officer of Synthesys
(25) told you that you could take those documents with you,

Page 63

(1)  did they?
(2)   A.   No, sir.
(3)   Q.   Why did you take them?
(4)   A.   Because I did not trust Mike Fleischhauer.
(5)   Q.   Did you take them because you knew you were
(6)  filing a lawsuit against Mike Fleischhauer and the
(7)  company?
(8)   A.   No, sir. It's because I did not trust
(9)  Mike Fleischhauer.
(10)  Q.   But by then you knew you were going to file a
(11) lawsuit, correct?
(12)  A.   That is correct.
(13)  Q.   Why did you not trust Mike Fleischhauer?
(14)  A.   Because in the past he had been known to not
(15) tell the truth on numerous occasions, and the payrolls
(16) that I generated had live checks in them.
(17)  Q.   Had what checks?
(18)  A.   Live checks.
(19)  Q.   What do you mean by that?
(20)  A.   Meaning they were live payroll checks.
(21)  Q.   I don't – I'm sorry, I don't understand
(22) what –
(23)  A.   The payrolls that he had me generate were
(24) live payroll checks. And if those payroll checks were
(25) not backed out, those payrolls were not

Page 64

(1)  funded, those were tax liabilities that could be
(2)  incurred and reported on every single employee's
(3)  taxes.
(4)   Q.   Okay. So the payroll generated would show –
(5)  would reflect that funds had been paid to employees
(6)  who didn't get those funds?
(7)   A.   That's correct.
(8)   Q.   Do you know if that was corrected?
(9)   A.   Do not know.
(10)  Q.   Prior to, say, January the 1st of the year
(11) 2002, had Mr. Fleischhauer done things that led you to
(12) lack trust in him?
(13)  A.   Prior to what date?
(14)  Q.   January the 1st of 2002.
(15)  A.   Yes, sir.
(16)  Q.   Okay. What specifically?
(17)  A.   Prior to that date, it was very apparent
(18) early on in 2001 that the funding that he had promised
(19) that would be there through March of 2002 was not
(20) going to be there.
(21)  Q.   Okay. So you think when he said that,
(22) funding is assured through March of 2002, that that
(23) was a lie?
(24)  A.   Yes, sir.
(25)  Q.   So you don't trust what he says?

Page 65

(1)   A.   No, sir.
(2)   MR. LEWIS:   Do you want to have lunch?
(3)  We're not going to get finished any time soon.
(4)   MR. BRAZIEL:   Okay. Then, yeah.
(5)   (Lunch Recess)
(6)   Q.   (By Mr. Lewis) Ms. Goetz, we're back from
(7)  lunch. We've taken a lunch break. Are you ready to
(8)  proceed?
(9)   A.   Yes, sir.
(10)  Q.   And you understand you're still under oath?
(11)  A.   Yes, sir.
(12)  Q.   Okay. After exchanging e-mails about your
(13) resume with Cindy at Personal Administrators, did you
(14) at some point in time interview for a job at Personal
(15) Administrators?
(16)  A.   Yes, sir.
(17)  Q.   Who did you interview with?
(18)  A.   With Mrs. O'Meara and with Cindy and another
(19) lady, and I don't recall her name. I believe she is
(20) the CPA or controller, perhaps.
(21)  Q.   Was that – and I will butcher the name, no
(22) doubt.
(23)  A.   She has an Asian name.
(24)  Q.   Quan Jung, or something?
(25)  A.   Quan Jung. That sounds correct.

Page 66

(1)   Q.   And did you interview with them all together
(2)  in the room?
(3)   A.   Yes, sir.
(4)   Q.   Did you interview with any of them
(5)  separately?
(6)   A.   I interviewed briefly with the two young
(7)  ladies prior to Mrs. O'Meara entering the room.
(8)   Q.   And that's Patti O'Meara, who's sitting here
(9)  today, correct?
(10)  A.   Correct.
(11)  Q.   Okay. During the course of that interview,
(12) did Patti or Cindy or the other lady –
(13)  MR. LEWIS:   How do you say her name?
(14)  MS. O'MEARA:   Quan.
(15)  Q.   – Quan, did any of them describe the
(16) business of Personal Administrators?
(17)  A.   Not in great detail.
(18)  Q.   Did you ask?
(19)  A.   Not specific questions, no, sir.
(20)  Q.   Okay. Did you develop any kind of
(21) understanding about what generally it was that they
(22) did?
(23)  A.   My understanding what they – was that they
(24) provided bookkeeping services to clients.
(25)  Q.   Did you understand that they handled the

**Page 67**

(1) financial affairs of their clients?
(2)     A.   I understood that they handled some financial
(3) affairs of clients, but not to what extent.
(4)     Q.   Okay. And at the time that you had that
(5) interview, you knew that Walter Loewenbaum was one of
(6) their clients, correct?
(7)     A.   I knew that he was a client, but not to what
(8) extent.
(9)     Q.   But you knew he was one of their clients,
(10) correct?
(11)    A.   That is correct.
(12)    Q.   At the time that you had that interview, you
(13) knew that you were preparing to sue Mr. Loewenbaum,
(14) correct?
(15)    A.   At the time of that interview, my lawsuit had
(16) not been filed in the court.
(17)    Q.   I understand that. But you knew that you
(18) were – that a lawsuit was being prepared to sue
(19) Mr. Loewenbaum, among others, correct?
(20)    A.   That is correct.
(21)    Q.   Okay. Did you tell anyone during the process
(22) of that interview that you were intending to sue one
(23) of their clients?
(24)    A.   They did not ask.
(25)    Q.   Did you tell them?

**Page 68**

(1)     A.   No, sir.
(2)     Q.   How would they have known to ask?
(3)     A.   I am not sure. I don't set the policies and
(4) procedures of that particular employer.
(5)     Q.   That's correct. Okay. What else was
(6) discussed at the interview?
(7)     A.   My qualifications for the job, my resume.
(8)     Q.   Did Mrs. O'Meara ask you any questions?
(9)     A.   I know we conversed, but I don't remember
(10) specific questions that we may have talked about.
(11)    Q.   Okay. And did you ask her anything – for
(12) any additional information about what the business was
(13) of Personal Administrators?
(14)    A.   Not specifically at that time, no, sir.
(15)    Q.   Excuse me just a minute.
(16) (Exhibit No. 2
(17) (marked for identification.
(18)    Q.   (By Mr. Lewis) The court reporter has just
(19) handed you a document that's titled Exhibit 2 – or
(20) that's labeled Exhibit 2. Could you tell the Court
(21) what that is, please?
(22)    A.   Resume of Stephanie Goetz.
(23)    Q.   Is that the resume that you sent to Personal
(24) Administrators on or about February 1st of 2002?
(25)    A.   To the best of my knowledge.

**Page 69**

(1)     Q.   Let's talk a little bit about what your
(2) job – how you described your job duties at Synthesys.
(3) The resume that you provided states that you manage
(4) accounts receivable/accounts payable, reconcile bank
(5) accounts, and process payroll. Is that correct?
(6)     A.   That is correct.
(7)     Q.   "Administration of the employee benefits
(8) programs, including self-funded health insurance
(9) plan." Is that correct?
(10)    A.   That is correct.
(11)    Q.   And we talked a little bit about that
(12) previously. Correct?
(13)    A.   That is correct.
(14)    Q.   "401(K) Plan Administration." Correct?
(15)    A.   That is correct.
(16)    Q.   What did you do with respect to the 401(K)
(17) plan administration?
(18)    A.   I provided reports to the 401(K) plan, which
(19) was Investmart –
(20)    Q.   Okay.
(21)    A.   – on each pay period regarding the amounts
(22) that were deducted from each respective employee's
(23) paycheck.
(24)    Q.   It says, "Counsel, advise, and assist
(25) employees and managers on issues related to human

**Page 70**

(1) resources policies and procedures." Did I read that
(2) correctly?
(3)     A.   That is correct.
(4)     Q.   How often did you perform those tasks?
(5)     A.   Approximately one to two times per week.
(6)     Q.   Okay. And let me skip down a couple.
(7) "Assist management with recruitment of new employees"?
(8)     A.   That is correct.
(9)     Q.   How did you help management recruit new
(10) employees?
(11)    A.   Placing ads on electronic sites, such as
(12) hotjobs, monster; placing ad in newspapers; contacting
(13) respective candidates, if requested to do so, to set
(14) up interviews.
(15)    Q.   Okay. I see up at the top it says – right
(16) under your name, it says 35,000 to – maybe I can't
(17) read that – 45,000? Is that correct? Do you see
(18) where it says that up at the top?
(19)    A.   I believe it says 35,000 to 40,000.
(20)    Q.   Okay. Whichever. So did you – in part of
(21) that interview process, did you discuss your salary
(22) requirements?
(23)    A.   Yes, we did.
(24)    Q.   Is that about the range you discussed?
(25)    A.   Yes, sir.

**Page 71**

(1)     Q.   Okay. At the end of this resume, were you
(2) offered a job – I mean, at the end of the interview
(3) process, were you offered a job?
(4)     A.   Yes, sir, I was.
(5)     Q.   Okay. And how much was your starting salary?
(6)     A.   My starting salary was 37,500.
(7)     Q.   At the time that they actually offered you
(8) the job, did you tell them that you were intending to
(9) sue their client, Walter Loewenbaum?
(10)    A.   No, sir.
(11)    Q.   Did you ever tell Patti O'Meara or any of the
(12) other supervisors at Personal Administrators that you
(13) were intending to sue Walter Loewenbaum before you
(14) actually sued him?
(15)    A.   No, sir.
(16)    Q.   Okay.
(17) (Exhibit No. 3
(18) (marked for identification.
(19)    Q.   (By Mr. Lewis) The court reporter has just
(20) handed you a document called "First Amended Collective
(21) Action Complaint." It's marked as Exhibit 3. Do you
(22) have that document in front of you?
(23)    A.   Yes, sir.
(24)    Q.   Okay. Could you tell the Court what this
(25) document is?

**Page 72**

(1)     A.   It is the First Amended Collective Action
(2) Complaint.
(3)     Q.   Okay. How is this document different from
(4) the Original Collective Action Complaint?
(5)     A.   It lists additional defendants.
(6)     Q.   And who are those additional defendants?
(7)     A.   The additional defendants are Personal
(8) Administrators and Patti O'Meara.
(9)     Q.   And why did you sue Personal Administrators
(10) and Patti O'Meara?
(11)    A.   For wrongful termination.
(12)    Q.   Okay. Anything else?
(13)    A.   And conspiring with Mr. Loewenbaum.
(14)    Q.   Okay. Anything else?
(15)    A.   No, sir.
(16)    Q.   Let's look at Page 5 of this document,
(17) please, moving down to No. 22. Now, it provides that,
(18) "On Monday, February 4, 2002, Plaintiff Goetz received
(19) a job offer from Personal Administrators, a company
(20) that manages individuals' assets." Correct?
(21)    A.   That is correct.
(22)    Q.   And how do you know that they are a company
(23) that manages individuals' assets?
(24)    A.   I learned that after I became employed there.
(25)    Q.   Okay. At the time that you knew that they

Page 73

(1) were a – that you first learned that they were a
(2) company that manages individuals' assets, what did you
(3) learn?
(4)     A.     For the brief time that I was employed there,
(5) the clients that they had, they did various
(6) bookkeeping items for them.
(7)     Q.     So is it your testimony that at the time that
(8) you interviewed with Patti O'Meara and others for the
(9) position with Personal Administrators, you were not
(10) aware that they were a company that manages
(11) individuals' assets?
(12)     A.     No, sir. I was not.
(13)     Q.     Okay. You were aware that they did some sort
(14) of bookkeeping for individuals?
(15)     A.     Yes, sir.
(16)     Q.     And did you have any idea that that
(17) bookkeeping was with respect to individuals' assets?
(18)     A.     I knew they did bookkeeping, but not to what
(19) extent.
(20)     Q.     I'm sorry. I don't understand that response.
(21) What did you think that they kept the books of?
(22)     A.     It could have been of their individual
(23) companies. It could have been of their personal
(24) finances.
(25)     Q.     So all of those things were possibilities,

Page 74

(1) right?
(2)     A.     Yes, sir.
(3)     Q.     Then it says, "Plaintiff Goetz's first day at
(4) Personal Administrators was Tuesday, February 5,
(5) 2002." Correct?
(6)     A.     Correct.
(7)     Q.     So on that day, you learned that they were a
(8) company that manages individuals' assets, correct?
(9)     A.     That is correct.
(10)     Q.     And at that point in time, you already knew
(11) that Walter Loewenbaum was a client of theirs,
(12) correct?
(13)     A.     Correct.
(14)     Q.     And by that point in time, you knew that they
(15) managed individuals' assets and you knew that Walter
(16) Loewenbaum was their client, correct?
(17)     A.     That is correct.
(18)     Q.     Did you tell anybody at that time that, I'm
(19) about to sue Walter Loewenbaum. Will that be a
(20) problem?
(21)     A.     No, sir.
(22)     Q.     Okay. You see No. 23, it says, "Loewenbaum
(23) is a major client of Personal Administrators."
(24) Correct?
(25)     A.     That is correct.

Page 75

(1)     Q.     How do you know that Mr. Loewenbaum is a
(2) major client of Personal Administrators?
(3)     A.     I was informed that by Mrs. O'Meara.
(4)     Q.     Okay. When were you informed that?
(5)     A.     On February 7th.
(6)     Q.     But at the time that she informed you that,
(7) you already knew he was a client of theirs, correct?
(8)     A.     I knew he was a client at that time, but I
(9) did not know how large of a client he was for Personal
(10) Administrators.
(11)     Q.     Okay. The next sentence reads, "Before
(12) Personal Administrators offered Plaintiff Goetz the
(13) job, they contacted Loewenbaum and asked if he would
(14) mind Plaintiff Goetz working for Personal
(15) Administrators." Did I read that correctly?
(16)     A.     I'm sorry?
(17)     Q.     No. 23 reads, "Before Personal Administrators
(18) offered Plaintiff Goetz the job, they contacted
(19) Loewenbaum and asked if he would mind Plaintiff Goetz
(20) working for Personal Administrators." Did I read that
(21) correctly?
(22)     A.     That is correct.
(23)     Q.     Okay. How do you know that?
(24)     A.     Mrs. O'Meara informed me that she had
(25) contacted Mr. Loewenbaum, and he had informed her that

Page 76

(1) he did not have a problem with me working at Personal
(2) Administrators.
(3)     Q.     Okay. When did she tell you that?
(4)     A.     On February 7th.
(5)     Q.     Okay. The last sentence in that paragraph
(6) reads, "Therefore, at the time that Loewenbaum
(7) approved the hiring of Plaintiff Goetz by Personal
(8) Administrators, she had not yet filed a FSLA lawsuit
(9) against Loewenbaum." Did I read that correctly?
(10)     A.     That is correct.
(11)     Q.     And is that a correct statement?
(12)     A.     Yes, sir.
(13)     Q.     But at that time you knew you were going to
(14) be filing an FSLA lawsuit against Loewenbaum, correct?
(15)     MR. BRAZIEL:     Objection; asked and
(16) answered.
(17)     THE WITNESS:     At that particular time,
(18) yes, it was my intention.
(19)     Q.     (By Mr. Lewis) Okay. No. 24, "Loewenbaum
(20) received a copy of this lawsuit on Wednesday,
(21) February 6, 2002, the day after Plaintiff Goetz began
(22) work for Personal Administrators." Is that correct?
(23)     A.     Yes, sir.
(24)     Q.     Okay. How do you know that that's – that
(25) that statement is true?

Page 77

(1)     A.     Per my attorney.
(2)     Q.     Then it reads, "On Thursday, February 7,
(3) 2002, Loewenbaum contacted O'Meara of Personal
(4) Administrators and conveyed to them that because
(5) Plaintiff Goetz sued him for FLSA violations, he did
(6) not want her working for Personal Administrators."
(7) How do you know that statement is true?
(8)     A.     Per a conversation I had with Mrs. O'Meara.
(9)     Q.     Okay. Specifically in that conversation,
(10) what did Mrs. O'Meara tell you?
(11)     A.     In the conversation I had with Mrs. O'Meara
(12) on February 7th, she informed me that she had received
(13) a phone call from Mr. Loewenbaum, and that
(14) Mr. Loewenbaum originally did not have a problem with
(15) me working for Personal Administrators, but because of
(16) the pending litigation against him, he now felt
(17) uncomfortable with me working at Personal
(18) Administrators.
(19)     Q.     Do you see where it – in that sentence, you
(20) make a very specific statement. You say that,
(21) "Loewenbaum contacted O'Meara of Personal
(22) Administrators and conveyed to them that because
(23) Plaintiff Goetz sued him for FLSA violations." Now,
(24) that's not what you just said when I asked you what
(25) she told you. You just said, because he sued me. Is

Page 78

(1) that correct?
(2)     A.     The pending lawsuit was pertaining to the
(3) FLSA violations.
(4)     Q.     I understand that, Ms. Goetz. But what I'm
(5) trying to figure out is what Mrs. O'Meara told you.
(6) In the conversation that you had with Mrs. O'Meara,
(7) did she say that the lawsuit was for FLSA violations
(8) or did she just say "the pending lawsuit"?
(9)     A.     Pending lawsuit.
(10)     Q.     Okay. And you also go on to say that because
(11) of that pending lawsuit, that Mr. Loewenbaum said, "he
(12) did not want me working for Personal Administrators."
(13) Is that correct?
(14)     A.     That is correct.
(15)     Q.     So your testimony here today is that
(16) Mrs. O'Meara told you that Mr. Loewenbaum told her
(17) that he did not want you working for Personal
(18) Administrators?
(19)     MR. BRAZIEL:     Objection;
(20) mischaracterizes the testimony.
(21)     Q.     (By Mr. Lewis) Is that correct?
(22)     A.     Mrs. O'Meara informed me that Mr. Loewenbaum
(23) did not want me working for Personal Administrators.
(24) That is correct.
(25)     Q.     Right. Did she say that Mr. Loewenbaum had

Page 79

(1) concerns?
(2)    A.    Yes, she did say Mr. Loewenbaum had concerns.
(3)    Q.    Okay. I would like for you to, as nearly as
(4) you can, describe to me, in as precise a language as
(5) you can, exactly what Mrs. Goetz told you in that –
(6) I'm sorry – that Mrs. O'Meara told you in that
(7) conversation.
(8)    A.    Mrs. O'Meara informed me that Mr. Loewenbaum
(9) felt uncomfortable with someone being close to his
(10) financial matters – so close to his financial matters
(11) who currently has a pending lawsuit against him.
(12)    Q.    That sounds reasonable to me. Does that
(13) sound reasonable to you?
(14)    A.    It's reasonable, but I did not have access to
(15) his financial matters at Personal Administrators.
(16) That was not an account that I was assigned to work on
(17) or manage.
(18)    Q.    How big of an organization is Personal
(19) Administrators?
(20)    A.    They're a very small company. I believe –
(21) Mrs. O'Meara has approximately 11 employees.
(22)    Q.    And how many – how large is their office
(23) space?
(24)    A.    It's in a type of a cottage, I would describe
(25) it as. It's not extremely large.

Page 80

(1)    Q.    Okay. And do you have any – did you come to
(2) have any idea of how many clients they had?
(3)    A.    No, sir.
(4)    Q.    Do you know – strike that question.
(5) What job were you hired to do there?
(6)    A.    The job that I was hired to do was to be an
(7) account manager, was my understanding. However,
(8) that's not what I was doing from the first few days
(9) that I was hired because there was no accounts that
(10) were assigned to me other than Judy Osborn's.
(11)    Q.    You were doing – you were assigned to be an
(12) account manager, correct, but you –
(13)    A.    That is correct.
(14)    Q.    Okay. Did you have any other assignments?
(15)    A.    I was making the deposits for any incoming
(16) checks from clients for payment for service, I
(17) believe. Since I was only there for a short span of
(18) time –
(19)    Q.    I understand. So with the – but you were
(20) assigned to do account managing, and that was going to
(21) be for specific accounts, right?
(22)    A.    That is correct.
(23)    Q.    And you were doing the, like, bookkeeping or
(24) entry of payments. Was that just for those specific
(25) accounts?

Page 81

(1)    A.    No, sir. The payments would have been for
(2) payments that were coming in for clients when they
(3) were paying their invoices.
(4)    Q.    That's for all the clients, right?
(5)    A.    For all the clients.
(6)    Q.    So if Mr. Loewenbaum would have been making a
(7) payment on any of his invoices, you would have had
(8) access to that information, correct?
(9)    A.    Correct.
(10)    Q.    At the time that you were working there –
(11) you began working there, did they tell you that they
(12) had security measures in place that would prevent
(13) one account manager from seeing the records maintained
(14) by other account managers?
(15)    A.    Verbally, I was informed that you should not
(16) be accessing and/or viewing other accounts that you
(17) were not currently working on or should not have
(18) access to.
(19)    Q.    Was there anything that you were aware of
(20) physically that would have prevented your access to
(21) those accounts?
(22)    A.    Not that I was aware of.
(23)    Q.    Would you turn to Page 8 of this document,
(24) please? Do you see up at the top where it states –
(25) where it provides "Breach of Contract"?

Page 82

(1)    A.    Yes.
(2)    Q.    All right. And No. 40 reads, "Defendants'
(3) failure to pay plaintiffs was a breach of contract."
(4) Did I read that correctly?
(5)    A.    That is correct.
(6)    Q.    Which defendants are you talking about?
(7)    A.    Which defendants?
(8)    Q.    Right.
(9)    A.    The board of directors and Michael
(10) Fleischhauer.
(11)    Q.    Okay. And it says "a breach of contract."
(12) What contract are you talking about?
(13)    A.    They failed to pay me on my designated
(14) payday.
(15)    Q.    Down at the bottom, it reads "Conspiracy to
(16) Retaliate." Do you see that language?
(17)    A.    Yes.
(18)    Q.    Okay. It says – No. 45 reads, "Loewenbaum,
(19) Personal Administrators, and O'Meara conspired to
(20) unlawfully retaliate against Plaintiff Goetz in
(21) violation of" – I'll skip the numbers – "of the
(22) FLSA." Did I read that correctly, except for skipping
(23) the numbers?
(24)    A.    That's correct.
(25)    Q.    What evidence do you have of a conspiracy to

Page 83

(1) keep from paying you? Let me state that over. What
(2) evidence do you have that they conspired to unlawfully
(3) retaliate against you?
(4)    MR. BRAZIEL:    Objection; form. Calls
(5) for a legal conclusion.
(6)    Q.    (By Mr. Lewis) You can still answer.
(7)    A.    Loewenbaum violated my employment contract
(8) with Personal Administrators and Mrs. O'Meara.
(9)    Q.    He thinks I asked for a legal conclusion, and
(10) that's what I think I got. I'm asking you – I'm
(11) asking you if there are any facts that you know of,
(12) like specifically what somebody said to somebody, they
(13) had a meeting somewhere where you think they talked
(14) about it. I'm just asking you for facts. I don't
(15) want to know what you think the law is. So let me ask
(16) it again. What evidence do you have that Loewenbaum,
(17) Personal Administrators, and O'Meara conspired to
(18) unlawfully retaliate against you?
(19)    MR. BRAZIEL:    Same objection.
(20)    THE WITNESS:    By Mr. Loewenbaum
(21) contacting Mrs. O'Meara originally and stating that he
(22) did not have a problem with me working for Personal
(23) Administrators, and then once he was served with the
(24) lawsuit and contacting her a second time and stating
(25) that he now did have a problem with me working for

Page 84

(1) Personal Administrators because he had been served
(2) with a suit, I consider that to be a form of
(3) retaliation.
(4)    Q.    (By Mr. Lewis) And you consider that to
(5) be – whatever conversations they had about that to be
(6) evidence of a conspiracy?
(7)    A.    Yes, I do.
(8)    Q.    Do you have any other evidence of that
(9) conspiracy?
(10)    A.    No, sir.
(11)    Q.    Turn the page, Page 9. Do you see up at the
(12) top where it says "Tortious Interference with
(13) Contractual Relations"?
(14)    A.    Yes.
(15)    Q.    No. 47 reads, "Plaintiff Goetz had a valid
(16) contract with Personal Administrators." Is that
(17) correct?
(18)    A.    That is correct.
(19)    Q.    What contract was that?
(20)    A.    My employment contract with Personal
(21) Administrators, because I was an at-will employee.
(22)    Q.    So it's your at-will employment relationship?
(23) Is that what you're talking about?
(24)    A.    That is correct.
(25)    Q.    No other contract?

Page 85

(1)  A.  That is correct.
(2)  Q.  Okay. And in the middle of the page it
(3)  reads, "Conspiracy to Tortiously Interfere with
(4)  Contractual Relations." Did I read that correctly?
(5)  A.  Yes, sir.
(6)  Q.  And you allege that, "Loewenbaum, Personal
(7)  Administrators, and O'Meara conspired to tortiously
(8)  interfere with Plaintiff Goetz's contractual
(9)  relations." What evidence do you have of that
(10) conspiracy?
(11)    MR. BRAZIEL:    Objection; form. Calls
(12) for a legal conclusion.
(13)    THE WITNESS:    Mr. Loewenbaum interfered
(14) with my employment contract between Personal
(15) Administrators and Mrs. O'Meara.
(16)    Q.  (By Mr. Lewis) And what facts support that
(17) allegation?
(18) A.  By contacting them –
(19) Q.  The same –
(20) A.  – once I was employed.
(21) Q.  Right. The same as you described previously
(22) about –
(23) A.  Yes, sir.
(24) Q.  – the other conspiracy allegation?
(25) A.  Yes, sir.

Page 86

(1)  Q.  Nothing else?
(2)  A.  Nothing else.
(3)  Q.  Okay. Down at the bottom it says "Civil
(4)  Conspiracy," then in No. 51 it reads, "Loewenbaum,
(5)  Personal Administrators, and O'Meara had a meeting of
(6)  the minds and acted together to violate Plaintiff
(7)  Goetz's state and federally protected rights. Did I
(8)  read that correctly?
(9)  A.  Yes, sir.
(10) Q.  Okay. What is the evidence that you're aware
(11) of that they had a meeting of the minds and acted
(12) together to violate your rights?
(13)    MR. BRAZIEL:    Objection; calls for a
(14) legal conclusion.
(15)    THE WITNESS:    Per the conversation with
(16) Mrs. O'Meara on February 7th, she said she had
(17) received a phone call from Mr. Loewenbaum.
(18) Q.  (By Mr Lewis) Okay. The same testimony –
(19) or the same conversation that you described with
(20) respect to the two conspiracy allegations, correct?
(21) A.  That is correct.
(22) Q.  Do you have any additional evidence of this
(23) civil conspiracy?
(24) A.  I also feel the meeting that I had between
(25) Mrs. O'Meara and Mrs. Osborn was in violation of my

Page 87

(1)  rights considering the fact that Mrs. Osborn knew I
(2)  was represented by counsel.
(3)  Q.  Was Mr. Loewenbaum there at that meeting?
(4)  A.  No, he was not.
(5)  Q.  Okay. How do you know that he had a meeting
(6)  of the minds with Mrs. O'Meara regarding violation of
(7)  your rights that was expressed at a meeting that he
(8)  wasn't at?
(9)  A.  She would have not been privy to the
(10) information of me filing a suit against him had he not
(11) informed her that I had. So she would not have been
(12) talking with me about the particular suit at that
(13) particular moment.
(14) Q.  Right. So do you assert that Mr. Loewenbaum
(15) violated your rights by telling Mrs. O'Meara that you
(16) were suing him? Is that correct?
(17) A.  That would be correct, in that he went to an
(18) employer that is currently employing me and informed
(19) them of pending litigations and requested that either
(20) I no longer work there or I drop the charges against
(21) him and dismiss him from the lawsuit.
(22) Q.  Okay. Now, did Mr. Loewenbaum tell you that?
(23) A.  Mrs. O'Meara did.
(24) Q.  And those are her words, that either – she
(25) told you – it's your testimony that she told you that

Page 88

(1)  you could either not work there anymore or that you
(2)  would drop the charges against him?
(3)  A.  That is correct.
(4)  Q.  And at this point – at the point in time
(5)  that Mr. Loewenbaum contacted – or allegedly
(6)  contacted Personal Administrators, by that time you
(7)  knew that he was a major client of theirs, right?
(8)  A.  On February 7th, it was becoming very clear
(9)  just how big of a client he was of Personal
(10) Administrators.
(11) Q.  And you knew that they were a company that
(12) manages individuals' assets by that time, correct?
(13) A.  At that particular time on February 7th, I
(14) discussed with Mrs. O'Meara exactly what Personal
(15) Administrators did and the position that it was
(16) perhaps placing Mr. Loewenbaum in.
(17) Q.  Would you turn the page to Page 10, please?
(18) Do you see where it says "Plaintiffs' Collective
(19) Allegations"?
(20) A.  Yes.
(21) Q.  All right. It states that, "Plaintiffs bring
(22) this collective action pursuant to Section 16(b) of
(23) the FLSA, 29 U.S.C. Section 216(b), on behalf of
(24) themselves and all other similarly situated
(25) employees." Do you see that?

Page 89

(1)  A.  Yes, sir.
(2)  Q.  Who are the similarly situated employees on
(3)  whose behalf you're bringing this lawsuit?
(4)  A.  The remainder of the employees of Synthesys
(5)  Technologies who also did not receive their paychecks
(6)  in a timely fashion.
(7)  Q.  Okay. And at that point – at the point in
(8)  time that Synthesys closed down, how many employees
(9)  were there?
(10) A.  As we previously discussed, approximately
(11) 39 employees.
(12) (Exhibit No. 4
(13) (marked for identification.
(14) Q.  (By Mr. Lewis) The court reporter has just
(15) handed you a document marked Exhibit 4. Correct?
(16) A.  Correct.
(17) Q.  Could you tell the jury what that document
(18) is, please?
(19) A.  Declaration of Stephanie Goetz.
(20) Q.  Okay. And when did you sign this
(21) declaration?
(22) A.  It's dated September 3rd, 2002.
(23) Q.  And could you confirm for me that that's your
(24) signature on this declaration?
(25) A.  Yes.

Page 90

(1)    MR. BRAZIEL:    September what?
(2)    MR. LEWIS:    She said the 3rd, but I
(3)  think it's 30th.
(4)    MR. BRAZIEL:    30th?
(5)    THE WITNESS:    30th, 2002. Yes, that is
(6)  my signature.
(7)  Q.  (By Mr. Lewis) Okay. And you swear that
(8)  everything in here is true, correct?
(9)  A.  Yes, sir.
(10) Q.  If you'll skip down to Section 2 of this, you
(11) say, "I was the office manager/administrator during
(12) this time." Correct?
(13) A.  That is correct.
(14) Q.  "Part of my job duties require me to assemble
(15) and process the payroll for all Synthesys employees."
(16) Correct?
(17) A.  That is correct.
(18) Q.  And if you skip down a little bit farther, in
(19) No. 3, you say, "Fleischhauer asked me and other
(20) employees to continue working without pay." Is that
(21) correct?
(22) A.  That is correct.
(23) Q.  Okay. Which other employees besides you did
(24) Mike Fleischhauer ask to continue working without pay?
(25) A.  The other employees that continued working

Page 115

(1) payroll runs. Since they would impact federal
(2) withholding, I felt it important to have some sort of
(3) documentation to back up the fact that these
(4) paychecks were never going to be distributed to the
(5) employees.
(6)    Q.   Your name is not on that list, is it?
(7)    A.   No, sir.
(8)    Q.   Okay. So whatever happened to these
(9) employees with respect to federal withholding, it
(10) didn't have a direct impact on you, did it?
(11)   A.   No, sir.
(12)   Q.   Okay.
(13) (Exhibit No. 15
(14) (marked for identification.
(15)   Q.   (By Mr. Lewis) And the court reporter has
(16) handed you Exhibit 15. Could you tell us what this
(17) document is, please?
(18)   A.   This is the payroll journal run, our detail
(19) report.
(20)   Q.   And on the first page of it, picking
(21) employee, say, Michael Alletto, it has his salary,
(22) right?
(23)   A.   That is correct.
(24)   Q.   And his Social Security, correct – Social
(25) Security deductions, correct?

Page 116

(1)    A.   That is correct.
(2)    Q.   Federal withholding deductions, correct?
(3)    A.   Yes, sir.
(4)    Q.   And it has that for all of these employees,
(5) correct?
(6)    A.   Correct.
(7)    Q.   Including you, right?
(8)    A.   Yes, sir.
(9)    Q.   And is this another document you took with
(10) you when you left?
(11)   A.   Yes, sir.
(12)   Q.   Okay.
(13) (Exhibit No. 16
(14) (marked for identification.
(15)   Q.   (By Mr. Lewis) The court reporter has handed
(16) you Exhibit 16. Correct?
(17)   A.   Yes, sir.
(18)   Q.   And could you read this, what – read the
(19) heading on this document, describing what it is?
(20)   A.   Synthesys Technologies, Incorporated
(21) Proprietary Information Agreement.
(22)   Q.   And if you would turn to the last page and
(23) tell me if that's your signature there.
(24)   A.   Yes, that is my signature.
(25)   Q.   And do you see that it's dated September the

Page 117

(1) 27th of 2000?
(2)    A.   Yes, sir.
(3)    Q.   Okay. And I'll read to you from Paragraph 1
(4) of the document. "At all times during the term of my
(5) employment and thereafter, I will hold in strictest
(6) confidence and will not, directly or indirectly,
(7) disclose, use, or publish any of the company's
(8) proprietary information (defined below), except as
(9) such disclosure, use, or publication may be required
(10) in the scope of my employment with the company." Did
(11) I read that correctly?
(12)   A.   Yes, sir.
(13)   Q.   Then in the next paragraph it defines
(14) "proprietary information," and it has an A, B, and C.
(15) I'll skip A and B and read from C. So that would
(16) read, "The term 'proprietary information' shall
(17) include, without limitation, (c) information regarding
(18) my own or other employees' salaries, incentive
(19) programs, stock options, or other sensitive
(20) information." Did I read that correctly?
(21)   A.   Yes, sir.
(22)   Q.   Then it says, "All of the foregoing is
(23) confidential and should not be discussed with other
(24) employees or with people outside of the company." Did
(25) I read that correctly?

Page 118

(1)    A.   Yes, sir.
(2)    Q.   Do you believe that you conformed with this
(3) agreement to not disclose confidential information?
(4)    MR. BRAZIEL:   Objection; form.
(5)    THE WITNESS:   I did not disclose any of
(6) the confidential information. I took out of the
(7) office these particular documents with any of the
(8) employees other than that respective individual.
(9)    Q.   (By Mr. Lewis) Just if you will look back
(10) with me to Exhibit 15. And up at the top, it says
(11) "From Edwards & George." Do you see that?
(12)   A.   With my attorney. Yes.
(13)   Q.   That's right. So you've – I actually got
(14) that document from your lawyer, right?
(15)   A.   Yes.
(16)   Q.   And this restriction was on providing this
(17) document to people outside the company, correct?
(18)   A.   That is correct.
(19)   Q.   And would you agree with me that your
(20) attorney was someone outside the company?
(21)   MR. BRAZIEL:   Objection; form.
(22)   THE WITNESS:   My attorney is someone
(23) outside the company, but it is attorney-client
(24) privilege as well.
(25)   Q.   (By Mr. Lewis) Right. But you agree with me

Page 119

(1) that he is someone outside the company, right?
(2)    A.   He is someone outside the company, yes.
(3)    Q.   And even though you had signed this
(4) agreement, you felt that it was okay to take the
(5) documents that you took with you, correct?
(6)    A.   Yes, sir.
(7)    MR. BRAZIEL:   Objection; form.
(8)    Q.   (By Mr. Lewis) And why – in light of this
(9) agreement, why did you feel like that it was
(10) appropriate for you to take these documents?
(11)   MR. BRAZIEL:   Objection; form.
(12)   THE WITNESS:   As previously stated,
(13) these were live payroll checks, which could impact
(14) each of these respective individuals' federal
(15) withholding.
(16)   Q.   (By Mr. Lewis) Okay. Well, I believe you
(17) took also, we've discussed, the documents that you –
(18) say Exhibit 15 - I'm sorry, Exhibit 13. Were these
(19) checks?
(20)   A.   Yes, sir.
(21)   Q.   Okay. It basically was instructions about
(22) checks, correct?
(23)   A.   Yes, sir.
(24)   Q.   Does this indicate that these checks were
(25) actually run?

Page 120

(1)    A.   Yes, sir.
(2)    Q.   Exhibit 13 indicates that?
(3)    A.   Yes, sir. This is the report that goes along
(4) with the journal report.
(5)    Q.   Okay. And you would agree with me, wouldn't
(6) you, that all of these documents have on them
(7) information regarding employees' salaries? Correct?
(8)    A.   That is correct.
(9)    Q.   And you will agree with me, won't you, that
(10) that – that disclosing information regarding
(11) employees' salaries was forbidden by the proprietary
(12) information agreement that you signed with Synthesys?
(13) Correct?
(14)   MR. BRAZIEL:   Objection; form.
(15)   THE WITNESS:   It is forbidden by the
(16) proprietary agreement. However, if I am not correct,
(17) in the state of Texas it is not forbidden to disclose
(18) your salary to another co-worker.
(19)   Q.   (By Mr. Lewis) But that's not what you did,
(20) is it?
(21)   A.   No, sir.
(22)   Q.   And it doesn't say "unless it's live checks,"
(23) does it?
(24)   A.   No, sir.
(25)   Q.   Okay.

WALLY LOEWENBAUM

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3     STEPHANIE GOETZ and        )   CIVIL ACTION NO.
       KEVIN McGILL,              )        A-02-CA-081-JN
 4     Individually and on Behalf )
       of All Other Similarly     )   JURY TRIAL DEMANDED
 5     Situated,                  )
       Plaintiffs,                )
 6                                )
       v.                         )
 7                                )
       SYNTHESYS TECHNOLOGIES,    )   Judge Nowlin
 8     INC., ET AL.,              )
       Defendants.                )   COLLECTIVE ACTION
 9
10          **********************************************
                         ORAL DEPOSITION OF
11                        WALLY LOEWENBAUM
                         NOVEMBER 21,2002
12          **********************************************
13
14
15
16
17         ORAL DEPOSITION of WALLY LOEWENBAUM, produced as a
18     witness at the instance of the Plaintiff, and duly
19     sworn, was taken in the above-styled and numbered cause
20     on the 21st day of November, 2002, from 9:59 A.M. to
21     2:47 P.M., before Leanna Lynch, CSR, in and for the
22     State of Texas, reported by machine shorthand, at the
23     offices of George & Donaldson, 114 W. 7th Street, Suite
24     1100, Austin, Texas, pursuant to the agreements stated
25     on the record and the Texas Rules of Civil Procedure.
```

EXHIBIT
*E*

WALLY LOEWENBAUM

1     A.   I just informed them that -- I think I left

2   them a voice mail, that I wanted to know if they had

3   hired her, and that -- inform them that I had gotten

4   notice that I was sued by her.

5     Q.   And you left that on her voice mail?

6     A.   I don't remember.

7     Q.   Did you have an actual live conversation with

8   anyone from Personal Administrators?

9     A.   I just don't remember.

10    Q.   Did you talk with a woman named Judy Osborn?

11    A.   I did.

12    Q.   What did you and Ms. Osborn talk about?

13    A.   I told -- is that something I can talk about?

14         MR. LEWIS:   Yeah.

15    A.   I told her that I had been sued, and I was

16   worried about the confidentiality of all my records.

17    Q.   (BY MR. BRAZIEL)  When did you talk with

18   Ms. Osborn?

19    A.   Sometime after I got the notice that I had been

20   sued.

21    Q.   Did you talk with her only one time?

22    A.   I don't remember.

23    Q.   Do you recall talking with Patti O'Meara about

24   steps that Personal Administrators had taken to, for

25   lack of a better word, protect your documents?

WALLY LOEWENBAUM

1    A.   I could have taken my books and records back,

2  and taken them out of there.

3    Q.   Did you tell Ms. Osborn that that was one of

4  your options?

5    A.   I think it was implicit that I had to figure

6  out something, but they also could have come up with,

7  you know, suggestions of theirs.  I didn't know what

8  they were going to do.

9    Q.   Was it implicit in your conversation that they

10  needed to protect your documents in some way, or you

11  would take your business elsewhere?

12    A.   It was stated that I was not going to have my

13  documents available to someone who was trying to do harm

14  to me.

15    Q.   And I'm just using the word you used, I'm not

16  trying to put words in your mouth.  You said that it was

17  implicit in that conversation that if they couldn't

18  secure the documents to your satisfaction, that you

19  would take your business elsewhere?

20    A.   I would take my documents elsewhere.

21    Q.   Take your documents elsewhere.  Would that be

22  the same thing as taking your business elsewhere?

23    A.   I don't know.

24    Q.   So you might have continued to use them, using

25  Personal Administrators, I mean?